**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KREG THERAPEUTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VITALGO, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | Case No. 11-cv-6771 |
| | ) | |
| VITALGO, INC., | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KREG THERAPEUTICS, INC., | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff/Counter-Defendant Kreg Therapeutics, Inc. ("Kreg") seeks a permanent injunction enjoining Defendant/Counter-Plaintiff VitalGo, Inc. ("VitalGo") from breaching the parties' agreements and refusing to recognize Kreg as an exclusive distributor of VitalGo beds in certain territories. See [17]. VitalGo has asserted counterclaims for account stated and breach of contract and seeks a declaratory judgment as to the parties' rights and obligations. See [26]. Currently before the Court are the parties' cross-motions for summary judgment on Kreg's claim. [78], [81].[1] For the reasons stated below, the Court grants in part and denies in part

_____

[1] The Court's working file indicates that in December 2012 and January 2013, the Courtroom Deputy attempted to contact counsel for Defendant to inquire about pleadings that do not appear on the docket

VitalGo's motion [81] and denies Kreg's motion [78] because it has not demonstrated an entitlement to the injunctive relief that it requests. However, recognizing that although Kreg is not entitled to injunctive relief on the record presently before the Court, it may be entitled to effective relief in some fashion yet to be determined, this case is set for further status hearing on April 18, 2013, at 9:30 a.m.

## I.  Background

### A.  Local Rule 56.1

At the summary judgment stage, the Court generally takes all relevant facts from the parties' Local Rule 56.1 submissions. Local Rule 56.1 supplements Federal Rule of Civil Procedure 56. *Sojka v. Bovis Lend & Lease, Inc*., 686 F.3d 394, 397 (7th Cir. 2012). "The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Id.* at 398. It is intended to advance the merits of litigation expeditiously, see *Stevo v. Fraser*, 662 F.3d 880, 887 (7th Cir. 2011), and achieves this end by requiring parties to hone in on the key facts, see L.R. 56.1(a) ("[A] movant shall not file more than 80 separately-numbered statements of undisputed material fact"), sparing the Court the arduous and time-consuming task of sifting through the record to find evidence to support a party's claim. See *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011); *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006); *Faath v. Cook Cnty.*, 2012 WL 4490801, at *2 (N.D. Ill. Sept. 28, 2012). The Seventh Circuit repeatedly has held that a district court is within its discretion to strictly enforce compliance with its local rules regarding summary judgment motions. See, *e.g.*, *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 359 (7th Cir. 2009); *Koszola v. Bd. of Educ. of City of Chi.*, 385

---

(see pp. 3-4, *infra*). At that time, there was an indication that additional filings might be forthcoming, but nothing has been placed on the docket since a change of address notice [91] filed by one of the attorneys for Kreg in November 2012.

F.3d 1104, 1109 (7th Cir. 2004). The Court will do so here, where its efforts to resolve the pending cross-motions for summary judgment have been significantly hampered by VitalGo's failure to comply with Local Rule 56.1.

As a moving party, VitalGo was required by Local Rule 56.1(a) to "serve and file" a statement of material facts as to which it "contends there is no genuine issue and entitle the moving party to a judgment as a matter of law," as well as "any affidavits and other materials" used to support the facts asserted in its statement. VitalGo filed a statement of facts, see [82], but, despite representing that it had contemporaneously attached or otherwise filed additional materials, did not file any evidence supporting the facts it asserted. The Court will disregard any factual statements that are improperly supported as a result of this omission.

As a non-moving party, VitalGo was required by Local Rule 56.1(b) to "serve and file" "any opposing affidavits and other materials," a memorandum of law, and a concise response to opponent Kreg's Local Rule 56.1(a) filings. VitalGo tendered to the Court three documents that appear to pertain to its Local Rule 56.1(b) obligations: "VitalGo Local Rule 56.1(b) Response to Plaintiff Local Rule 56.1(a) Statement of Uncontested Material Facts," "56.1(b)(3)(6) Statement of Additional Material Facts as to Which There is No Material Issue of Fact Requiring Denial of Kreg's Motion for Summary Judgment," and "Memorandum of in Opposition to Plaintiff Motion for Summary Judgment."[2] But VitalGo did not "serve and file" these documents; none of them appears on the docket, and Kreg's reply brief [90] strongly suggests that none was served on Kreg either. When the Court observed that it was in possession of documents that had not been properly filed (an apparent artifact of VitalGo's attempt to comply with Local Rule 5.2(f), which requires litigants to submit to the Court a "judge's copy" of certain filings), the Court's Courtroom Deputy on at least two occasions attempted to contact counsel for VitalGo to alert it

---

[2] The Court notes that none of these submissions was accompanied by any affidavits or other materials.

to the omission.[3]  But to no avail; these materials remain absent from the docket.  Just as it is not

the Court's job to scour the record in search of factual disputes, it is not the Court's – or its

Courtroom Deputy's – job to monitor the docket to ensure that all documents have been properly

filed.  It is "[a]n advocate's job * * * to make it easy for the court to rule in his client's favor

* * *," *Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613 (7th Cir. 2006), not the other

way around.  The Court will disregard the three documents that were submitted but not "served

and filed" in accordance with Local Rule 56.1(b). See also Fed. R. Civ. P. 56(c) ("The court need

consider only the cited materials * * *").

Accordingly, the facts related below are taken, to the extent they are supported by

admissible and docketed evidence, from Kreg's Local Rule 56.1(a) statement [79], VitalGo's

Local Rule 56.1(a) statement [82], Kreg's response to VitalGo's Local Rule 56.1(a) statement

[88], Kreg's Statement of Additional Material Facts [88] at 19-22, and the documents that it

cites.

## B.     Facts

Kreg is an Illinois corporation that provides specialty medical equipment to hospitals and

nursing homes.  Its principal place of business is in Chicago, Illinois.  VitalGo is a Delaware

corporation that produces the "Total Lift Bed," a hospital-grade bed that can elevate a patient

from a lying to a fully-standing position.  VitalGo's principal place of business is in New York.

On or about December 23, 2009, Kreg and VitalGo entered into an agreement ("the

Agreement") pursuant to which Kreg was granted the exclusive right to distribute the Total Lift

---

[3] Kreg's reply brief in support of summary judgment [90], which was properly filed and bears a certificate of service indicating that it was served on counsel for VitalGo, also alerted counsel to his failure to file a response and even suggested a remedial course: filing a request to extend the time to file a response. [90] at 5.  The Court never received such a request.  Nor has the Court ever received notice from VitalGo's counsel – which he provided via e-mail to Kreg's counsel [90-1] – that "[t]he ecf site has once again garbled my password, etc. and refuses to let me file."

Bed in certain regions of the country in exchange for its agreement to commit to purchase minimum quantities of the bed. The Agreement provided, in pertinent part:

1. <u>Distribution Right</u>. The Company [VitalGo] hereby appoints and grants Distributor [Kreg] the exclusive and non-assignable right to sell, lease and rent the equipment of the Company ("Equipment") listed in the then current "Price List" (Exhibit "A" attached hereto). The exclusive distribution right shall be limited to customers who have places of business in, and will initially use the Company's products in the Territories set forth in Exhibit "B" attached hereto. Accordingly, during the terms of this Agreement no other entity, including the Company, shall sell, lease or rent the Equipment to any entity in the Territories. Distributor agrees that to maintain said exclusivity in the Territories set forth in Exhibit "B", Distributor agrees to the following minimum purchases set forth in Paragraph 1(B).

A. Distributor has previously purchased three (3) beds from Company for its Chicago, Illinois distribution center. Distributor agrees to purchase an additional seventeen (17) Total Lift Beds for the Territories. * * * Company is developing a Total Lift Bariatric Bed and anticipates that it will be available in September 2011. Subject to the Total Lift Bariatric Bed being completed and available, Distributor will reasonably consider purchasing fifteen (15) Total Lift Bariatric Beds by February 1, 2011.

B. <u>Future Yearly Purchase Minimums.</u> Both Company and Distributor agree that a yearly minimum purchase requirement will need to be established per Territory for Distributor to maintain its exclusivity in each Territory. However, since Company's product is relatively new to the market and new products are still being introduced, this number cannot be established at the execution of this contract. Therefore the parties agree as follows:

i. In consideration of the purchase of Total Lift Beds, Distributor is awarded exclusive distribution rights in four Territories: Indiana, Illinois, Wisconsin and greater metropolitan Atlanta, Georgia, until January 31, 2011.

ii. Distributor may renew these exclusive distribution rights for an additional twelve (12) month period by agreeing to commit to future minimum purchases in 2011 based on the following formula prior to the completion of the current period.

(a) A territory is defined as a state, city or geographic area containing 6 million people. Distributor will agree to purchase a minimum of $200,000 of Equipment yearly per Territory.

(b) All purchases of Equipment made by Distributor following its initial purchase of seventeen Total Lift Beds will be credited toward its minimum purchase requirement for the period beginning January 31, 2011.

(c) The yearly minimum purchase requirement of $200,000 per Territory may be adjusted up or down by the Company based on the yearly purchases of other distributors in different territories. * * *

(d) Each Distributor's yearly minimum purchase requirement will be adjusted up or down pro rata based on the population of the geographic regions in their Territory.

(e) The Company may lower these minimums or extend the period of time to complete yearly purchases in their discretion in order for the Distributor to maintain its exclusivity in each Territory. If Distributor does not meet the annual minimum purchase requirement in any fiscal year, Company's sole remedy is to strip Distributor of its exclusivity in that Territory only.

C. Provided Distributor commits to minimum purchases in 2011, notwithstanding anything to the contrary herein, Company cannot replace Distributor in the Territories until February 1, 2012, and thus Distributor will have exclusive distribution rights in the Territories of Indiana, Illinois, Wisconsin, and greater metropolitan Atlanta, Georgia until at least February 1, 2012. Further, if Distributor meets the minimum purchase requirements it may continue as the exclusive distributor in the Territories beyond February 1, 2012.

* * *

21. <u>Term</u>. The term of this Agreement shall extend until January 31, 2011, unless sooner terminated, but, pursuant to section 1.C above, Company cannot replace Distributor in the Territories until February 1, 2012, and thus Distributor will have exclusive distribution rights in the Territories of Indiana, Illinois, Wisconsin, and greater metropolitan Atlanta, Georgia until at least February 1, 2012, provided Distributor meets minimum purchase requirements for 2011. Thus, all rights and obligations of the parties shall survive until at least February 1, 2012. Termination shall not relieve either party of obligations incurred prior thereto.

* * *

23. <u>Notice or Communication</u>. Any notice or communication required or permitted hereunder (other than Administrative Notice) shall be in writing and shall be sent by registered mail, return receipt requested, postage prepaid and addressed to the addresses set forth below * * * *

* * *

30. <u>Applicable Law</u>. This Agreement shall be governed by the laws of the State of New York * * *

[79-1].

On April 6, 2010, Kreg and VitalGo executed an amendment ("the Amendment") to the

Agreement. The preamble of the Amendment stated that "Distributor and Company desire to

amend the Agreement as provided herein to add additional Territories." The Amendment, pursuant to which Kreg agreed to purchase sixteen additional beds, provided in pertinent part:

> 1.    Company and Distributor agree to amend Exhibit B to the Agreement to add the additional Territories of Greater Metropolitan Jacksonville, Florida; Greater Metropolitan Orlando, Florida; Region extending between Greater Metropolitan Tampa, Florida and Greater Metropolitan Ft. Myers, Florida; Greater Metropolitan Philadelphia and South New Jersey including Trenton and Camden; and Greater Metropolitan St. Louis, Missouri. * * *

> 2.    Distributor shall have exclusive distribution rights, as set forth in Paragraph 1 of the Agreement, for all Territories of amended Exhibit B until at least May 31, 2012.  If Distributor meets the minimum purchase requirements set forth in the Agreement for any of the additional Territories it may continue as the exclusive distributor in the additional Territories beyond May 31, 2012, 2012 [sic].

> > * * *

> 6.    Prices, terms and yearly quotas for the additional Territories shall be the same as set forth in the Agreement, except that the dates for the computation of yearly minimums for the additional Territories * * * shall begin on June 30th 2010.[4]

> 7.    All other terms and conditions of the Agreement remain unchanged.

> 8.    This Amendment shall be governed in all respects by the substantive laws of the State of New York without giving effect to conflict of laws principles.

> 9.    This Amendment, and the Agreement, as amended, constitute the entire agreement between the parties with respect to the subject matter of the Agreement.  There are no terms or conditions other than those set forth in this Amendment and the Agreement, as amended.

[79-2].

In December 2010, Craig Poulos, Kreg's President, and Ohad Paz, VitalGo's Managing Director and CEO, had an in-person meeting in Chicago. At that meeting, Poulos orally committed to purchase $800,000 worth of beds for the four territories listed in the Agreement for

---

[4] "June 30th 2010" was a handwritten revision to the printed date of June 1, 2010; representatives of both parties initialed the alteration.

the year 2011. This commitment was not memorialized in a purchase order or other writing. [79-9]. Kreg purchased only $19,142.70 worth of beds, related parts, and accessories in 2011. [79-7]. (It purchased $146,475.00 worth in 2009 and $167,658.85 worth in 2010. *Id.*)

In March 2011, Jarrett Armstrong, VitalGo's Vice President of Sales, e-mailed Poulos to ask if Armstrong could get involved with one of Kreg's "trials" of the bed at Johns Hopkins.[5] Poulos declined Armstrong's request ("Yes, I and the rep would 'mind' very much if you got involved in our business at JH's at this point") and copied Paz in his response. [79-6]. One month later, a consultant e-mailed Paz to notify him that Poulos was "calling the bed the Kreg bed" and wanted VitalGo to "stay out of their way at Johns Hopkins." Paz responded, "The fact that he is making a study is good for us. Why should we fight it. It is for the Total Lift Bed. We will act when the time is right for us. I am in waiting position." Paz continued, "The fact he is calling the bed KREG bed is a Joke, as we can decide at any time not to sell him beds and in such case he has no beds." Paz's response also noted that Kreg "was the best dealer" and "had until January 2011 exclusivity in a few territories including Chicago area. * * * He was supposed to buy more beds to keep exclusivity, which he did not do, so lost it." [79-8].

Paz clarified this e-mail in his Third Declaration in this case: "I could not believe that Mr. Poulos referred to VitalGo's equipment as the 'Kreg bed.' I had already informed Kreg earlier in the year that it had lost its original territories because it had failed to commit to purchase those territories' yearly quotas. Having read Mr. Poulos' March 14 email, I decided not to respond and concluded that I would terminate VitalGo's Amendment with Kreg as soon as Kreg failed to commit to purchase its yearly quotas for the additional territories." [37] ¶ 66.

---

[5] Kreg marketed the beds, which it modified, to its clients across the country by developing "protocols" and sponsoring in-hospital trials and studies involving the use of the beds.

In early May 2011, a representative from a scale vendor e-mailed Paz some photographs that the vendor had taken of Kreg's booth at a convention. The vendor noted that "[o]ne of the beds have [sic] different wheels installed," and "there was no VitalGo nameplates on the beds at all." Paz wrote back, "We have problems with the guy. He is making changes with the beds without notifying us, although we told him he must. I will speak with you over the phone. * * * When are you back home so we can talk? Some good things may happen." A few days later, the vendor responded with more details about the Kreg booth. In his response, Paz reiterated that "Kreg is trouble" and expressed hope that "it will be solved soon." He said that he would "talk with Craig [Poulos] in a few weeks." [79-20].

Meanwhile, Paz was also talking with RecoverCare, another medical supply company, to establish an agreement pursuant to which RecoverCare would distribute Total Lift Beds. On June 2, 2011, Paz sent an e-mail to a RecoverCare representative, telling him that Kreg's "exclusivity ended, for some territories on January 31st 2011 and some May 31st 2011, two days ago. * * * I was just going to write him a letter letting him know his exclusivity is over." Paz continued: Kreg "never had nationwide exclusivity" and "will not get any more beds from us. He has 36 beds." [79-25].

That same day, Paz sent Poulos an e-mail and letter of notice that the parties' agreements were terminated. In the e-mail, Paz asserted that "the agreements are terminated" because "[d]espite our conversation in January 2011 and the different options we spoke about, you did not make any commitment for purchase of our products for 2011, as you should have, in order to keep your exclusivity." In the attached letter, Paz reiterated that "our two agreements dated December 23, 2009 and April 6th 2010 between our companies have expired." He requested that

Kreg "immediately refrain from any further representation in regard to your status as our exclusive distributor in any of the territories." [79-21].

Paz later testified at his deposition that he "was wrong it expired May 31st, 2011. According to the change in the amendment, it expired June 30, 2011." "It," he explained, was "the exclusivity for the additional territories which are added in the amendment which are not in the main – first agreement from – the agreement dated December 2009." Paz further explained, "What I'm saying is, and I repeat it, according to the document that I had, which was not with the handwriting, it said May 30, 2010, from – excuse me – from June 1st, 2010, which ended May 31st, 2011. And according to that information in my hand at that time, I wrote this letter." Paz testified that the letter "should be changed that the agreement expired June 30, 2011," but that he had not sent a letter to make that correction because "nobody brought to my attention" the error, including Poulos. [79-3]

Poulos responded to Paz's June 2 correspondence via e-mail on June 6, 2011. He noted that he was "disappointed to receive [Paz's] letter" because "[Kreg] has spent countless hours, money and resources to build the reputation, market and to support your products in our exclusive territories where we have introduced your products to our hard-earned loyal clients. [Kreg] never would have made these expenditures and introductions but for the fact that our territories are exclusive and we believed our agreements would continue at least through February 1, 2012." [79-22]. Nonetheless, Poulos averred that Kreg was "willing to agree to commit to future minimum purchases in 2011" if VitalGo were able to update it on "certain latent design issues with the Total Lift Beds" and "the production status of Total Lift Bariatric Beds," which the Agreement had contemplated but which had not yet come to fruition. Poulos reiterated, a few paragraphs later, that Kreg "is willing to agree to this commitment" "to buy

products in 2011," but that "[r]ight now, your products do not meet our clients [sic] clinical practices and safety needs." Poulos closed by suggesting that the parties "work on a realistic timetable for [Kreg's] commitment to buy products in 2011," provided that Paz "cooperat[ed] to address the issues raised in this e-mail." [79-22].

Paz responded with a lengthy letter on June 8. In it, he reiterated that his position that "[t]he two agreements had expired on January 31st and May 31st, respectively," and that Kreg failed to give VitalGo its commitment to purchase additional beds before the January 31, 2011 deadline. Paz referred to the meeting he and Poulos had in December 2010 and asserted that, at that meeting, options for extending the agreement had been discussed. Paz also disputed Poulos's allegations that there were design flaws in the Total Lift Bed and contended that Kreg had impermissibly made modifications to the Total Lift Beds without VitalGo's consent. "In summary," Paz wrote, "four months had passed since the expiration date, you did not purchase any beds, you did not make any signs of ordering one, we had no indications of what is done with the beds, you never came back to us even once with a request to renew your exclusivity in any way with same terms or otherwise. You knew very well that the agreement period is over, so we really don't understand why you are complaining now." Paz closed his letter by offering to discuss with Kreg and Poulos "new terms and new agreement." [79-23].

This proposed discussion does not appear to have happened. Instead, on June 15, 2011, VitalGo and RecoverCare issued a press release announcing a "partnership to launch the Total Lift Bed$^{TM}$." The press release announced that the Total Lift Bed "will now be distributed nationwide exclusively through RecoverCare's network of 158 service centers." [79-19]. VitalGo and RecoverCare formalized their relationship in an August 1, 2011 "Product Supply Agreement." The Product Supply Agreement by its terms granted RecoverCare the exclusive

right to market, sell and rent the Total Lift Bed "anywhere within the United States." The Product Supply Agreement further provided that "[e]xcept for existing rental relationships, which shall not be extended beyond existing terms, this right to market, rent and sell to Customers shall be exclusive to RecoverCare." [79-26].

On September 15, 2011, Kreg sent VitalGo a purchase order for five Total Lift Beds and some related parts. [79-27]. A Kreg employee sent a follow-up e-mail to Paz and others at VitalGo on September 19. [79-28]. VitalGo declined to fill the purchase order for the beds ("we cannot supply you with additional beds"), but stated that it would continue to supply Kreg "with after sale support of spare parts" for the beds it had already purchased. VitalGo also asserted that "invoice #09-117 is still open and due at this time." It requested that Kreg "submit payment for this invoice as well as for the new order and we will be happy to send you the requested parts." *Id.*

About a week after this exchange, Kreg filed the instant lawsuit against VitalGo, seeking an injunction enjoining VitalGo from breaching the parties' agreements and refusing to recognize Kreg as its exclusive distributor in the Original and Additional Territories through May 31, 2012. VitalGo counterclaimed, asserting claims for account stated, breach of contract, and declaratory judgment. Kreg moved for a temporary restraining order [4], which the Court denied after determining that Kreg had not made the requisite "persuasive showing of irreparable harm." [47] at 9. The parties then completed discovery and filed the instant cross-motions for summary judgment on Kreg's claim.

## II.    Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). On cross motions for summary judgment, the Court construes all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir.2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)); see also *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

### A.    Jurisdiction

VitalGo's lead argument in support of its motion for summary judgment is that the Court lacks jurisdiction over Kreg's complaint because Kreg has failed to demonstrate that the amount

in controversy exceeds the $75,000 threshold required to establish diversity jurisdiction. See 28 U.S.C. § 1332(a)(1). There is no dispute that the parties are citizens of different states.

"In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977). The Seventh Circuit has further clarified that "the value of the object of the litigation is the 'pecuniary relief' that would flow to the plaintiff (or defendant) from the court's granting the injunction or declaratory judgment." *Am.'s MoneyLine, Inc. v. Coleman*, 360 F.3d 782, 786 (7th Cir. 2004); see also *BEM I, L.L.C. v. Anthropologie, Inc.*, 301 F.3d 548, 553 (7th Cir. 2002) ("[T]he jurisdictional minimum in diversity cases is not the amount sought by the plaintiff but the amount at stake to either party to the suit."). "There are four ways in which a request for an injunction might be thought to carry a case over the amount in controversy threshold. The first way * * * is if the value of the injunction to the plaintiff exceeds the statutory minimum." *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 609 (7th Cir. 1997). The second way is "if the injunction sought by the plaintiffs would require some alteration in the defendant's method of doing business that would cost the defendant at least the statutory amount." *Id.*

The Court need not look beyond these first two of these four methods to conclude that the amount in controversy is satisfied here. Despite Kreg's continually shifting requests for relief, compare [47] at 5 & n.2 (noting that Kreg initially asked the Court to "enjoin VitalGo from refusing to recognize Kreg as its exclusive distributor for all of the territories listed in amended Exhibit B through May 31, 2012," yet also "adopted an alternative position – namely, that VitalGo be ordered, at a minimum, to immediately fill Kreg's order for five additional beds"), with [79] ¶ 76 (explaining that Kreg "seeks an injunction requiring VitalGo to sell it Total Lift

Beds and Total Lift Bariatric Beds in an amount sufficient to satisfy the Minimum Purchase Requirements of $200,000 per Territory"), and [80] at 30 ("[Kreg] therefore requests that the Court order an injunction that grants [Kreg] exclusive distribution rights as the Amendment provides, or through May 31, 2012, plus the additional nine (9) months of exclusivity that has been stolen from [Kreg] by VitalGo."), it is clear that more than $75,000 is at stake here. If exclusivity were not worth at least $200,000 per territory per year to Kreg, it would never have signed the agreement in the first place. Likewise, VitalGo itself argued at the temporary restraining order stage that "if this Court were to grant Kreg the relief it seeks, it would have a devastating effect on VitalGo. VitalGo would be forced to terminate or breach its existing agreement with RecoverCare if it were required to acknowledge Kreg as an exclusive distributor. VitalGo could, as a result, lose its lucrative contract with a national distributor that, unlike Kreg, is willing and able to commit to future purchases of the Total Lift Bed though 2014." [13] at 17-18. The VitalGo/RecoverCare agreement contains minimum purchase requirements of over 1,000 beds through 2014, which amounts to at least hundreds of thousands of dollars in sales to VitalGo. The Court concludes that its jurisdiction is secure here. See *Rock Energy Cooperative v. Vill. of Rockton*, 614 F.3d 745, 748 (7th Cir. 2010) ("The record shows, however, that the parties are fighting over the transfer of approximately $10 million in assets, and so we are satisfied that our subject-matter jurisdiction is secure."); *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006) ("Only if it is legally certain that the recovery (from plaintiff's perspective) or cost of complying with the judgment (from defendant's) will be less than the jurisdictional floor may the case be dismissed.").

### B.    Injunctive Relief

Kreg seeks a permanent injunction prohibiting VitalGo from breaching the parties' agreement and amendment.   "Where a permanent injunction has been requested at summary judgment, [the Court] must determine whether the plaintiff has shown: (1) success, as opposed to a likelihood of success, on the merits; (2) irreparable harm; (3) that the benefits of granting the injunction outweigh the injury to the defendant; and, (4) that the public interest will not be harmed by the relief requested." *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003).

### 1.    Success on the Merits

Here "the merits" consist of a claim for breach of contract.   The parties do not dispute that New York law, as provided in the Agreement and Amendment, governs this claim.   Because the Agreement and Amendment concern the purchase, sale, and distribution of goods, the New York Uniform Commercial Code applies.   See *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 726 (2d Cir. 1992).

Under New York law, the elements for a breach of contract action are (1) the existence of a contract between plaintiff and defendant; (2) performance of the contract by the plaintiff; (3) breach by the defendant; and (4) damages suffered as a result of the breach.   *Clearmont Prop., LLC v. Eisner*, 872 N.Y.S.2d 725, 728 (N.Y.  App. Div. 2009); see also *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). There is no dispute that Kreg has satisfied the first element; the parties agree that the Agreement and Amendment are valid, enforceable contracts.  The parties dispute, however, whether Kreg upheld its end of the parties' bargain. This dispute primarily hinges on the scope and effect of the Amendment. According to Kreg, "[t]he Amendment served to extend [Kreg's] exclusive distribution rights for the Total Lift Bed through May 31, 2012."  [80] at 12.   Kreg points to

Paragraph 2 of the Amendment, quoted above, and contends that "[t]he Amendment could not be any clearer" that Kreg's exclusive distribution rights for all territories extended "until at least May 31, 2012," irrespective of any action on its part. Even if the Amendment is not so broad as to supersede the commitment obligations set forth in the Agreement, Kreg continues, it "is nevertheless still entitled to summary judgment because it has shown that it timely agreed to the minimum purchase requirements." VitalGo argues – in the only summary judgment brief that it properly filed – that Kreg breached its obligations under the Agreement and Amendment because it failed to make "any commitment to purchase Vitalgo products – let alone a written commitment." [83] at 11.

Resolution of this dispute requires the Court to interpret the terms of the Agreement and Amendment. Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Green field v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* (quoting *Slamow v. Del Col*, 594 N.E.2d 918, 919 (N.Y. 1992)). "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.* A contract is unambiguous if the language it uses "has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 170-71 (quotation omitted); see also *White v. Cont'l Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007) (same). Conversely, contract language is ambiguous "if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). It is important

for the Court to read the agreement as a whole; if the document as a whole "makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement]." *Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. 1998) (alteration in original). "Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought." *Id.* at 180-81 (quoting *Atwater & Co. v Panama R.R.*, 159 N.E. 418, 419 (N.Y. 1927)); see also *Consedine v. Portville Cent. Sch. Dist.*, 907 N.E.2d 684, 689 (N.Y. 2009) (explaining that the Court must consider the agreement as a whole "to ensure that undue emphasis is not placed on particular words and phrases").

### a.    Scope of Paragraph 2 of Amendment

Paragraph 2 of the Amendment provides that Kreg "shall have exclusive distribution rights, as set forth in Paragraph 1 of the Agreement, for all Territories of amended Exhibit B until at least May 31, 2012. If Distributor meets the minimum purchase requirements set forth in the Agreement for any of the additional Territories it may continue as the exclusive distributor in the additional Territories beyond May 31, 2012, 2012." [79-2 (repetition of "2012" in original)]. Read in isolation, as Kreg implicitly urges the Court to read it, this provision appears to fully supersede Paragraphs 1 and 21 of the Agreement, which require Kreg to commit to (¶1) and then actually make (¶21) minimum purchases to extend its term of exclusivity. Yet this construction of Paragraph 2 places "undue emphasis  * * * on particular words and phrases" and ignores other facially contradictory portions of the Amendment, namely those stating that "[p]rices, terms and yearly quotas for the additional Territories shall be the same as set forth in the Agreement, except that the dates for the computation of yearly minimums for the additional Territories * * *

shall begin on June 30th 2010," that "[a]ll other terms of the Agreement remain unchanged," and that "Distributor and Company desire to amend the Agreement as provided herein to add additional Territories." It also guts the modifying phrase "as set forth in Paragraph 1 of the Agreement," which points to the provision establishing the commitment requirements. If Paragraph 2 is given the sweeping effect advocated by Kreg, these provisions of the Amendment would be rendered meaningless, as would the portions of the Agreement addressing commitments, dates, and minimum purchase requirements. "Any interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless * * * is not preferred and will be avoided if possible." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d. 89, 99 (2d Cir. 2012) (quotation omitted); *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007) ("A reading of the contract should not render any portion meaningless."). Accordingly, the Court declines to interpret the contract in this fashion. Instead, looking to the Agreement and Amendment as a whole, and considering the parties' expressed intent to "amend the Agreement * * * to add additional Territories" while leaving "[a]ll other terms and conditions of the Agreement * * * unchanged," the Court concludes that Paragraph 2 grants Kreg exclusive distribution rights in all of the Territories through May 31, 2012, provided that the "prices, terms and yearly quotas" set forth in the Agreement and reiterated in Paragraphs 6 and 7 of the Amendment are satisfied. The Court notes that the extrinsic evidence submitted by Kreg supports this interpretation; both Paz [79-21] and Poulos [79-22] appeared to be operating on the belief that Kreg at least was required to commit to make minimum purchases to ensure its exclusivity.

### b.    Kreg's Performance

Reading Paragraph 2 in this fashion gives rise to the question of whether Kreg satisfied the terms of the Agreement and the Amendment. That is, whether Kreg "agree[d] to commit to future minimum purchases" "prior to the completion of the current period."[6]  Kreg contends that it did.  It points to deposition testimony from Poulos stating that he orally committed in December 2010 to purchase $800,000 worth of beds[7] for the four original territories.  As to the additional territories added by the Amendment, Kreg contends that it made the requisite agreement to commit in Poulos's June 6, 2011 e-mail to Paz.  VitalGo does not (properly) dispute that Poulos made either of these alleged statements; instead, it points to the equivocal language of the June 6, 2011 e-mail and asserts that "it is clear from these writings that, in fact that there has never been an [sic] commitment." [83] at 11.

VitalGo's brief, read generously and in conjunction with its Rule 56.1 statement, appears to suggest that any commitment that Kreg made was required to be in writing.  The Court assumes, as does Kreg, see [90] at 10-11, that VitalGo is attempting to argue that Kreg's agreement to commit to a minimum purchase had to be in writing pursuant to Paragraph 23 of the Agreement.  Paragraph 23 provides that "[a]ny notice or communication required or permitted hereunder (other than Administrative Notice) shall be in writing and shall be sent by registered mail."  VitalGo appears to suggest that Kreg's alleged commitments were ineffectual in light of this provision.  Kreg disagrees; it contends that Paragraph 1 of the Agreement, which sets forth the "agreeing to commit to future minimum purchases" requirement, "says nothing

---

[6] The parties agree that commitment rather than actual purchase is the determinative event.

[7] Kreg's Local Rule 56.1 statement avers that Poulos "agreed to purchase the same number of Total Lift Beds in 2011 as it had in 2010, and agreed to meet the remainder of the Annual Minimum Purchase through purchases of the Total Lift Bariatric Bed." [79] ¶ 35.  However, the deposition pages cited in support of this testimony were not submitted to the Court (see Fed. R. Civ. P. 56(e); Local Rule 56.1(a)), so the Court disregards this largely irrelevant factual assertion.

about any 'commit[ment]' having to be in writing * * * * [and] does not even require a 'commitment,' merely ***an agreement*** to commit to future purchases." [90] at 10-11 (emphases in original).

The Agreement and Amendment are silent as to what form Kreg's commitment (or agreement to commit) had to take. Paragraph 1(B)(i) of the Agreement enables Kreg to renew its exclusive distribution rights "by agreeing to commit to future minimum purchases," while Paragraph 1(C) provides only that VitalGo cannot replace Kreg in the original territories "[p]rovided Distributor commits to minimum purchases in 2011." Paragraph 23 of the Agreement requires that "notice[s]" and "communication[s]" be in writing and served by registered mail. Neither the Agreement nor the Amendment defines the terms "notice" and "communication."

The parties neglected to clarify what constitutes a "notice" or "communication" for which Paragraph 23 requires a writing. They also neglected to use one of those terms to refer to the commitment, notwithstanding their use of the term "notice" elsewhere in the Agreement. See [79-1] ¶¶ 8, 22. (The Agreement does not appear to reference any "communications.") The parties also failed to include in Paragraph 1 a requirement that the commitment be in writing, even though they incorporated such an explicit requirement into at least six other paragraphs of the Agreement. See *id.* ¶¶ 8, 11, 12, 13, 28, 29. In short, the Agreement and Amendment are far from exemplary. But when arms-length agreements have been negotiated by sophisticated parties, courts in New York are "extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) (quotation omitted); see also *200 Genesee St. Corp. v. City of Utica*, 844 N.E.2d 742, 743 (N.Y. 2006). Here, VitalGo

obliquely invites the Court to do just that. The Court declines this invitation. It is clear from the parties' Agreement that they contemplated requiring writings in certain situations and knew how to impose writing requirements in these situations; Kreg's "commitment" or "agree[ment] to commit" was not one of them. Given the import of this commitment to the parties' dealings, explicitly requiring it to be in writing would seem prudent. That decision was for the parties to make upon drafting, however, not for the Court to make if a dispute arose. The Court declines to read a "writing" requirement into Paragraph 1 of the Agreement.

The question therefore becomes whether Kreg in fact committed to make the minimum purchases within the timeframes in which it was required to make them. VitalGo has not properly submitted any evidence to refute Kreg's evidence that Poulos on December 10, 2010 orally committed to purchase $800,000 worth of beds for the four original territories. The Court therefore accepts this fact as true. Under the plain language of Paragraph 1 of the Agreement, and Paragraph 2 of the Amendment, that commitment vested in Kreg exclusive distribution rights in Indiana, Illinois, Wisconsin, and greater metropolitan Atlanta, Georgia until at least May 31, 2012. On the record before it, the Court concludes that Kreg performed as to the original territories.

The same cannot be said of the additional territories. Kreg points to Poulos's June 6, 2011, e-mail as evidence of its commitment. But that e-mail states only that Kreg was "willing to agree to commit to future minimum purchases in 2011" if VitalGo satisfied certain of its demands – an offer to agree, perhaps, but not a firm commitment. Indeed, the e-mail's concluding sentence underscores the tentative at best nature of Kreg's "commitment": "I suggest we work on a realistic timetable for [Kreg's] commitment to buy products in 2011; but first we need your cooperation to address the issues raised in this e-mail." [79-22]. Even taken in the

light most favorable to Kreg, this communication does not suggest that a commitment had been made, or even that a firm agreement to commit had been reached. Kreg has not directed the Court to any other evidence of any commitment as to the additional territories, see [80] at 16-17, nor has it suggested that the December 2010 oral agreement was applicable to the additional territories. The Court thus concludes that Kreg did not perform as to the additional categories prior to "the deadline for [Kreg] to commit," June 30, 2011.

VitalGo claims that Kreg failed to perform under the Agreement in two other ways as well. See [80] at 11-12. VitalGo's first claim, that Kreg violated Paragraph 5 of the Agreement by entirely failing to market the Total Lift Bed in the additional territories, is completely unsupported by evidence or even a citation to the record. Kreg, however, has introduced uncontroverted evidence chronicling its marketing efforts in several of these markets in painstaking detail. [88-8]. On the record as it stands, the Court must reject VitalGo's claim that Kreg made no effort to market the beds. VitalGo's second claim is that Kreg violated Paragraph 5 by making unauthorized alterations to the Total Lift Bed without VitalGo's prior written approval, even after VitalGo demanded that Kreg stop. VitalGo supports this allegation with admissions from Kreg that "Defendant has demanded on multiple occasions that Plaintiff stop making alterations to the Total Lift Bed" and that Kreg "has continued to make alterations to the Total Lift Bed." [49] ¶¶ 23-24. Kreg does not contest that it has made and continues to make alterations to the beds notwithstanding VitalGo's entreaties for it to stop, see [88] ¶¶ 20, 23, 24, but disputes that the alterations were unauthorized and violative of the Agreement. See *id.* ¶21. In some other case, this dispute may well rise to the level of a genuine issue of material fact. Here, however, nothing in the Agreement or Amendment – least of all Paragraph 5, which reads in its entirety, "Sales. Distributor shall use its best efforts to promote the sale and distribution of

the Equipment and to provide adequate support or [sic] its customers" – prohibits Kreg from altering the beds. Paragraph 12 of the Agreement prohibits Kreg from using or referring to VitalGo's trademarks and trade names "except as specified in this Agreement or as expressly authorized by Company in writing" but says nothing about altering the beds or referring to them as "Kreg Beds." Similarly, Paragraph 19 says that "[a]ny tampering, misuse or negligence in handling or use of the Equipment renders the warranty void," but does not prohibit Kreg from engaging in this or other bed-altering conduct. Paz may have "told" Poulos not to alter the beds, see [79-20], but that does not a contract provision make, particularly where the Agreement expressly requires all modifications and amendments to be in writing, [79-1] ¶ 29, and the Amendment unequivocally states that "[t]here are no terms or conditions other than those set forth in this Amendment and the Agreement, as amended." [79-2] ¶ 9. As VitalGo has not demonstrated that any issues concerning Kreg's alteration of the beds were even addressed in the parties' agreement, the Court declines to conclude that Kreg breached the agreement by altering the beds.

Having considered all the arguments and evidence before it on the question of Kreg's performance, the Court is left with a mixed conclusion: Kreg performed as to the original territories but did not perform as to the additional territories. Neither party has provided the Court with guidance as to how New York courts would view this situation. The parties have, however, in their actions as well as their filings in this case consistently treated the agreements as to the original territories and the additional territories as two distinct agreements. See, e.g. [17]; [79-21]; [79-22]; [80] at 10; [83] at 12. Under New York law, "when two parties have made two separate contacts it is more likely that promises made in one are not conditional on performances required by the other." *Novick v. AXA Network, LLC*, 642 F.3d 304, 312 (2d Cir. 2011) (quoting

*Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 873 (N.Y. 1972)). The test for separability looks to whether "there would have been no bargain whatever, if any promise or set of promises were struck out," but "boils down to the intent of the parties." *Id.* (quotations omitted). Here, either set of territories could be struck out while keeping intact the essence of the Agreement as to the other set; each set of territories had its own minimum purchase requirement, date for commitment, and date for the minimum to be satisfied. Indeed, the parties' course of dealing and arguments in this matter suggest that they viewed the obligations as separate and distinct notwithstanding their embodiment in a single set of instruments. The Court therefore concludes that the parties' agreement as to the original territories was distinct from their agreement as to the additional territories. And, as explained above, the evidence before the Court at this juncture demonstrates that Kreg performed under the "agreement" pertaining to the original territories but not the "agreement" pertaining to the additional territories. Accordingly, Kreg's motion for summary judgment [78] is denied to the extent it pertains to the additional territories, and VitalGo's motion for summary judgment [81] is granted to the extent it pertains to the additional territories. The Court proceeds with its analysis of the cross-motions only to the extent that they implicate the original territories.

### c. VitalGo's Performance

The third element in Kreg's underlying breach of contract action is breach by VitalGo. Kreg contends that VitalGo breached the parties' agreement on September 19, 2011, when VitalGo refused to honor Kreg's purchase order for five beds. See [17] ¶¶ 25-26. VitalGo does not contest that it denied Kreg's September 2011 purchase order, nor has it properly submitted any argument that this denial was not a breach of the Agreement.

Kreg contends that VitalGo "acted wrongfully in refusing to recognize [Kreg] as a distributor – as opposed to an 'exclusive distributor' – and refusing to sell [Kreg] the Total Lift Bed." [80] at 23. Kreg asserts that "[t]he Agreement and Amendment are crystal clear on VitalGo's available remedies should [Kreg] fail to agree to commit to Annual Minimum Purchases with respect to any of the territories." *Id.* The Agreement, however, says no such thing. It provides, as VitalGo's Paz testified at his deposition, that VitalGo's "sole remedy is to strip Distributor of its exclusivity in that Territory only" if Kreg "does not meet the annual minimum purchase requirement in any fiscal year." [79-1] ¶ 1(B)(ii)(e). Committing to meet a requirement is not the same as actually meeting the requirement. The Agreement makes this distinction in Paragraph 1(C): "Provided Distributor commits to minimum purchases in 2011, notwithstanding anything to the contrary herein, Company cannot replace Distributor in the Territories until February 1, 2012, and thus Distributor will have exclusive distribution rights in the Territories of Indiana, Illinois, Wisconsin, and greater metropolitan Atlanta, Georgia until at least February 1, 2012. Further, if Distributor meets the minimum purchase requirements it may continue as the exclusive distributor in the Territories beyond February 1, 2012." (The Amendment later changed the operative date to May 31, 2012. See [79-2] ¶ 2.) In September 2011, there were still several months remaining in 2011 and more than 6 months remaining until Kreg's deadline to meet the minimum purchase requirements. If Kreg failed to meet the minimum purchase requirements by May 31, 2012, *then* VitalGo's only remedy was to strip of its exclusive distribution rights. Until that time, VitalGo's actions were not explicitly restricted by the Agreement.

Yet in New York, "all contracts imply a covenant of good faith and fair dealing in the course of performance. This covenant embraces a pledge that neither party shall do anything

which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002) (quotations and citations omitted). "The rule is grounded in many cases that in every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." *Grad v. Roberts*, 198 N.E.2d 26, 28 (N.Y. 1964); see also *511 W. 232nd Owners Corp.*, 773 N.E.2d at 501 (noting that the implied duty of good faith and fair dealing "encompass[es] any promises which a reasonable person in the position of the promise would be justified in understanding were included" (quotation omitted)). A breach of the duty of good faith and fair dealing amounts to a breach of contract, *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002); New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Id.* at 81.

VitalGo's failure to sell Kreg the beds that it requested prevented Kreg from upholding its end of the bargain; Kreg could not possibly "promote the sale and distribution of the Equipment" or "meet the annual minimum purchase requirement" if VitalGo refused to provide Kreg with the beds that it requested. The Agreement and Amendment countenanced that Kreg would make purchases of the bed, the only source of which was VitalGo. Necessarily implicit in such an arrangement – though not expressly provided for in the Agreement or Amendment – is an understanding that VitalGo would sell Kreg the beds that it properly requested, and there is no suggestion that Kreg's written purchase order failed to conform with the requirements set forth in the Agreement. See [79-1] ¶ 8; [79-27]. The Court therefore concludes that VitalGo breached

the parties' agreement by failing to provide Kreg with the beds that it ordered in September 2011.

### d.  Damages

The final element that Kreg must establish to show success on the merits in pursuit of its request for a permanent injunction is damages suffered as a result of VitalGo's breach.  Kreg contends that, as a result of VitalGo's breach, it "will be unable to fulfill its contractual obligations to health care providers," even though it has "to date, avoided defaulting on its obligations." [80] at 26.  Kreg further contends that it "stand[s] to lose profits from the sale of Total Lift Beds," and will endure "immeasurable damage * * * to [its] reputation in the health care industry." *Id.* It paints a dire picture: "The damage to [Kreg's] reputation caused by its sudden inability to deliver the Total Lift Bed will cause immeasurable damage through unknown loss of business across all of [Kreg's] product line, which includes scores of other items. The loss of this business is simply incalculable." *Id.* at 27.  The parties have not provided the Court with any New York law (or much substantive argument) on the issue of damages.

Lost profits as damages for breach of contract are permitted in New York.  *Kenford Co. v. Cnty. of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986).  But "it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty.  In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and traceable to the breach, not remote or the result of other intervening causes." *Id.*  "In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." *Id.*  The same is true for loss of goodwill or damage to reputation. See *Toltec Fabrics, Inc.  v. August Inc.*, 29 F.3d 778, 780-81 (2d Cir. 1994).

Kreg claims that it "purposefully reduced its direct sales efforts in an attempt to mitigate its damages by reducing the possibility that [Kreg] would have to tell a customer that it could not provide a Total Lift Bed," [88] ¶ 86, and accepted fewer "trial" orders of the beds. *Id.* ¶ 87. Kreg also asserts that its "rentals of the Total Lift Bed have dropped." *Id.* ¶ 88. None of these factual assertions, all of which relate to lost profits, is (properly) controverted. A trier of fact reasonably could conclude from Kreg's evidence that its sales dipped as a direct result of the disruption in Kreg's bed supply. Yet the record is devoid of evidence suggesting that "the parties contemplated lost profits as a potential basis for damages in the event of a breach." *Awards.com, LLC v. Kinko's, Inc.*, 834 N.Y.S. 2d 147, 152 (N.Y. App. Div. 2007), *aff'd*, 925 N.E.2d 926 (N.Y. 2010). To the contrary, the Agreement contains an indemnity provision pursuant to which Kreg "agrees to hold the Company free and harmless from any and all claims, damages, and expenses of every kind or nature whatsoever * * * as a direct or indirect consequence of termination of this Agreement in accordance with its terms," [79-1] ¶ 27, which suggests, at least when taken in the light most favorable to VitalGo, that the parties did not contemplate lost profits as a basis for damages. And New York courts have expressed some reluctance to find contemplation of liability for lost profits even where plaintiffs are able to establish that they purchased property for resale purposes and expected to turn a profit doing so. *Cornell Holdings, LLC v. Woodland Creek Assocs., LLC*, 882 N.Y.S. 2d 586, 588 (N.Y. App. Div. 2009).

But the Court need not definitively resolve the lost profits issue at this time and on this record because the alleged damages to Kreg's reputation, dire as they may be if they came to fruition, lack any factual basis in the record currently before the Court. In its summary judgment materials, Kreg has not presented any evidence that its reputation has actually been harmed. Rather, at least as of the time of the summary judgment briefing, Kreg could muster only

speculation that its reputation might be harmed at some time in the future.  To be sure, time has elapsed between the filing of Kreg's motion for summary judgment requesting permanent injunctive relief and the Court's resolution of that motion.  Yet Kreg has not sought leave to supplement the record with any evidence that its concerns about possible harm to its reputation actually have come to fruition.  In view of the foregoing discussion, the Court concludes that Kreg has not demonstrated the last element of actual success on the merits (damages) and therefore is not entitled to judgment as a matter of law at this time on its request for permanent injunctive relief notwithstanding the absence of disputed facts in the record.[8]

With that said, Kreg may yet be entitled to an alternative remedy.  Federal Rule of Civil Procedure 54(c) provides in relevant part that "[e]xcept as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which a party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."  As the Seventh Circuit has explained, "Rule 54(c) was designed to divorce the decision what relief to award from the pleadings and arguments of counsel; the court is to determine, and award, the right relief in each case even if the complaint is silent on the question."  *Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1298 (7th Cir. 1987); see also *Felce v. Fiedler*, 974 F.2d 1484, 1501 (7th Cir. 1992).  New York courts similarly have held that a court may "adapt its relief to the exigencies of the case," *Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439, 443 (1956), including by ordering damages to be paid where the specific relief demanded (here, an injunction) is not practical. *423 S. Salina Street, Inc. v. City of Syracuse*, 68 N.Y.2d 474, 483 (1986).  See also *Ill. Physicians Union v. Miller*, 675 F.2d 151, 158 (7th Cir. 1982) (explaining that damages may be awarded even if not requested in complaint); *EEOC v. Massey-Ferguson, Inc.*, 622 F.2d 271, 277

---

[8] As discussed below (see pp. 31-32, *infra*), some of the other factors that figure in the analysis also weigh against granting the injunctive relief that Kreg requests.

(7th Cir. 1980) (same); *Freed v. Travelers*, 300 F.2d 395, 399 (7th Cir. 1962) (same); Wright & Miller, 10 FED. PRAC. & PROC. CIV. § 3664 (3d ed. 2012) (same).

Here, as the Court has recognized from the outset of the litigation, given that "the situation facing Kreg is fluid and could change rapidly," "changed circumstances," [47] at 11, may warrant the revisiting of prior rulings at later stages of the case. That observation remains equally valid, if not more so, on the basis of the current record. As noted above, as to the original territories, Kreg has established the first three elements of a claim for breach of contract under New York law: (1) the existence of a contract, (2) Kreg's own performance, and (3) VitalGo's breach. See *Clearmont Prop.*, 872 N.Y.S.2d at 728; *Eternity Global Master Fund*, 375 F.3d at 177. Although on the current record Kreg has fallen short of the mark on the fourth element needed to secure injunctive relief at this time – damages – the fluidity referenced above prevents the Court from foreclosing the possibility that Kreg may be entitled to damages after further development of the record. In particular, the Court cannot exclude the possibility that the breach identified above in regard to VitalGo's obligations in the original territories resulted in the kinds of damages that Kreg anticipated but was not (yet) able to prove in the materials submitted in support of the instant motion for injunctive relief.

The upshot, therefore, is that the Court will deny both parties' motion for summary judgment insofar as they pertain to the original territories and will not enter the injunctive relief requested by Kreg. However, the denial of Kreg's motion is subject to the discussion above concerning potential alternative relief if, upon further consideration, the circumstances of the case so warrant.

### 2. Irreparable Harm/Absence of Adequate Remedy At Law

In the interest of completeness, the Court now returns to the other factors that bear on Kreg's request for injunctive relief. At bottom, consideration of those factors leads the Court to conclude that even if Kreg were able to demonstrate success on the merits, it still would not be entitled to a permanent injunction at this time because it has not demonstrated irreparable harm or the absence of an adequate remedy at law. These two requirements tend to merge. See *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.3d 380, 386 (7th Cir. 1984). An injury is "irreparable" when it is of such a nature that the injured party cannot be compensated in damages or when damages cannot be measured by any pecuniary standard. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997).

As explained above, there is no evidence that Kreg has suffered an injury to its reputation, or even that its loss of reputation is a presently existing actual threat. Such an injury could "constitute irreparable harm that is not compensable by an award of money damages." *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994); see also *Klein, Wagner & Morris v. Lawrence A. Klein, P.C.*, 588 N.Y.S.2d 424, 426 (N.Y. App. Div. 1992). Kreg's alleged loss of profits, even if contemplated by the parties' contract, almost certainly cannot. The Seventh Circuit has expressed doubt that "business losses from the termination of a distribution license are irreparable." *Micro Data Base Sys., Inc. v. Nellcor Puritan Bennett, Inc.*, 165 F.3d 1154, 1157 (7th Cir. 1999). "Only money is at issue," it has explained, and, moreover, "[c]ourts routinely tote up and award as damages the loss inflicted by wrongful terminations of distributorships." *Id.* Indeed, in this case Kreg has produced quantitative evidence documenting its reduced sales; the next logical – and potentially workable – step would be to assign dollar figures to those losses. The Court thus concludes that injunctive relief would not be warranted even if Kreg had demonstrated success on the merits. The Court

need not and does not consider the balance of harms, see *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703 (7th Cir. 2005), but notes that the parties have not provided the Court with any reason to depart from its previous analysis of this factor. See [47] at 11-12.

## IV.    Conclusion

For the reasons stated above, the Court grants in part and denies in part VitalGo's motion [81] and denies Kreg's motion [78] because it has not demonstrated an entitlement to the injunctive relief that it requests. This matter is set for further status hearing on April 18, 2013, at 9:30 a.m.

Dated: March 28, 2013

_____
Robert M. Dow, Jr.
United States District Judge