# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KREG THERAPEUTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11-cv-6771 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| VITALGO, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In this diversity action, Plaintiff Kreg Therapeutics, Inc. brings a breach of contract claim against Defendant VitalGo, Inc. In ruling on the parties' cross-motions for summary judgment [78] and [81] and on Plaintiff Kreg's second motion for summary judgment [95], the Court concluded that Plaintiff Kreg had established three of the four elements of its breach of contract claim, [see 93, at 31], but that material issues of fact remained as to the issue of damages, [see 131, at 16]. The Court thus set the case for a trial on damages. Shortly before the bench trial, Defendant VitalGo filed a motion for judgment on the pleadings and to dismiss the first amended complaint for failure to state a claim [206], and Plaintiff filed a motion for leave to file a second amended complaint [210]. The Court took these motions under advisement and deferred briefing until after the bench trial. [See 208, 213.] On September 26 and 27, 2016, the Court conducted a bench trial solely on the issue of damages. The parties subsequently submitted post-trial briefs.

For the reasons set forth below, Plaintiff's motion for leave to file a second amended complaint [210] is granted, and Defendant VitalGo's motion for judgment on the pleadings and to dismiss the first amended complaint for failure to state a claim [206] is denied as moot. Defendant's oral Rule 52(c) motion is denied. The Court also sets forth below its findings of fact

and conclusions of law, as required under Federal Rule of Civil Procedure 52(a). The facts are drawn from the documentary record in the case and the evidence and testimony presented at trial. The Court makes all factual findings by a preponderance of the evidence. To the extent that any finding of fact may be more properly characterized as a conclusion of law, it should be so construed. Similarly, to the extent that any conclusion of law may be more properly characterized as a finding of fact, it should be so construed. After considering the admissible evidence and assessing the credibility of the witnesses, the Court concludes that Plaintiff Kreg is entitled to $642,610 in damages plus $364,593 in prejudgment interest, for a total award of $1,007,203. This case is set for further status hearing on October 10, 2017, at 10:00 a.m.

## I. Procedural Background

Plaintiff Kreg and Defendant VitalGo have been engaged in litigation before this Court for a considerable period of time. Plaintiff Kreg filed this breach of contract suit in September 2011, seeking a permanent injunction enjoining Defendant VitalGo from breaching the parties' agreements and refusing to recognize Kreg as an exclusive distributor of VitalGo beds in certain territories. [See 1 (Complaint), 17 (First Amended Complaint).] Defendant VitalGo asserted counterclaims for account stated and breach of contract and seeking a declaratory judgment as to the parties' rights and obligations.[1] [See 26.] The parties filed cross-motions for summary judgment on Kreg's breach of contract claim, and the Court issued an opinion on March 28, 2013, concluding that Plaintiff Kreg had established three of the four elements of its breach of contract claim but was not entitled to injunctive relief because it had not proven damages. [93.] The Court noted that it could not preclude the possibility that the VitalGo's breach "resulted in the kinds of damages that Kreg anticipated but was not (yet) able to prove," and thus Kreg "may

---

[1] VitalGo also filed a separate lawsuit against Kreg on May 25, 2016, alleging copyright and trademark infringement and unfair competition under federal and state law, which is currently pending before this Court. [See *VitalGo, Inc. v. Kreg Therapeutics, Inc.*, No. 16-cv-5577.]

be entitled to damages after further development of the record." [93, at 30–31 (discussing the case law permitting an award of damages in certain circumstances even if not requested in the complaint).]

On June 18, 2013, Plaintiff Kreg filed a second motion for summary judgment [95] requesting an award of monetary damages. The Court denied this motion, concluding that "it is readily apparent that there is a material dispute as to the certainty with which Kreg can prove the fair market value of the lost asset[—the agreement]." [131, at 15.] The Court later set a damages bench trial for March 9, 2015. [See 152, 153.] However, before damages could be determined at the bench trial, VitalGo filed for bankruptcy in December 2014, causing the 2011 Lawsuit to be stayed. [155.] VitalGo later moved for a voluntary dismissal of its bankruptcy, which the bankruptcy court granted in December 2015. On March 24, 2016, this Court reinstated this lawsuit and reset the damages bench trial. [167.] The bench trial was held on September 26 and 27, 2016. [See 214, 215.] At the close of Plaintiff Kreg's case-in-chief, Defendant VitalGo made an oral Rule 52(c) motion for judgment on partial findings, arguing that Kreg had not proved that it was harmed and that Kreg had not proven the existence of any damages with reasonable certainty. [Trial Tr. Vol. III, at 240:10–241:6; 227, at 41.]

## II.     Findings of Fact

### A.        The Agreements

Plaintiff Kreg Therapeutics is a medical supply distributor that provides specialty medical equipment to hospitals and nursing homes. [131, at 9; Trial Tr. Vol. I, at 37:8–21 (Poulos testimony).] VitalGo produces the "Total Lift Bed," a hospital-grade bed that can elevate a patient from lying down to a fully-standing position. [131, at 9–10.] Kreg and VitalGo negotiated an agreement in 2009, when VitalGo was interested in contracting with a distributor

that could introduce the Total Lift Bed to the hospital market.  [Trial Tr. Vol. I, at 39:17–40:3 (Poulos testimony).]  Kreg recognized a potential new market for the Total Lift Bed in intensive and critical care units and felt that it had the capacity to create demand for the Total Lift Bed because Kreg had "a lot of existing hospitals * * * where [it was] strong in [intensive care units]."  [*Id.*, 40:8–22.]  Poulos testified that he made it "very clear" to VitalGo that this would be a "big undertaking to develop a new market," and that accordingly, Kreg would only become a distributor of Total Lift Beds if VitalGo would grant Kreg exclusive distribution rights in certain territories.  [*Id.*, at 39:24–40:5.]

On December 23, 2009, Kreg and VitalGo entered into an agreement ("the Agreement") pursuant to which Plaintiff Kreg was granted the exclusive right to distribute the Total Lift Bed in Illinois, Indiana, Wisconsin, and greater metropolitan Atlanta, Georgia ("the original territories") through January 31, 2011.  Kreg, in turn, was required to meet certain minimum purchase requirements and to "use its best efforts to promote the sale and distribution of" the Total Lift Bed.  [Trial Exs. 1, at 1, 2, 4; 131, at 10.]  On April 6, 2010, Kreg and VitalGo executed an amendment ("the Amendment") to the Agreement, which extended Kreg's exclusive distribution period to May 31, 2012 and gave Kreg exclusive distribution rights in additional territories through June 30, 2011.  [131, at 10.]

As the Court previously determined at the summary judgment stage, Kreg upheld its end of the bargain as to the original territories.  Kreg orally committed to purchasing the requisite quantity of Total Life Beds for each of the four original territories.  [131, at 11.]  Kreg also offered evidence at trial as to how it used its best efforts and invested substantial resources in building a market for the Total Lift Bed.  [See 231, at 6; Trial Ex. 113; Trial Tr. Vol. I, at 45:9–55:4.]  Notwithstanding Kreg's performance, VitalGo principal Paz sent an email and letter to

Kreg principal Poulos terminating the parties' agreements on June 2, 2011. [*Id*.] Paz directed Kreg to "immediately refrain from any further representations in regard to your status as our exclusive distributor in any of the territories," and Paz further stated that Kreg "will not get any more beds from us." [*Id*.] On June 15, 2011, VitalGo and another medical product distributor, RecoverCare, issued a press release announcing a "partnership to launch the Total Lift Bed" and providing that the Total Lift Bed "will now be distributed nationwide exclusively through RecoverCare's network of 158 service centers." [*Id*.] VitalGo's agreement with RecoverCare granted RecoverCare the exclusive right to distribute the Total Lift Bed through 2014, in exchange for RecoverCare's commitment to purchase 195 Total Lift Beds for nearly $3 million, at a price-per-bed nearly double the amount that Kreg had agreed to pay under the Agreement. [See 231, at 2.] On September 15, 2011, Kreg sent VitalGo a purchase order for five Total Lift Beds, but VitalGo refused to honor the purchase order, stating that Kreg was no longer an authorized distributor of the Total Lift Bed. [131, at 11.] Poulos also testified that after VitalGo's breach, VitalGo also refused to sell Kreg spare parts for the bed, which made Kreg's inventory of beds difficult to maintain and repair.[2] [Trial Tr. Vol. I, at 66:9–23; 231, at 10.]

## B.    The Bench Trial

The bench trial was held on September 26 and 27, 2016, and the Court heard testimony from VitalGo's Managing Director and CEO Ohad Paz and from Kreg's President Craig Poulos. The parties also presented the testimony of their dueling experts, William Bradshaw for Plaintiff Kreg, and James Godbout for Defendant VitalGo. The experts presented their views on the

---

[2] Defendant VitalGo argues that there is no credible evidence that VitalGo refused to supply replacement parts to Kreg and that VitalGo sent Kreg an email stating that VitalGo would continue to provide replacement parts. [Trial Ex. 133.] However, Poulos credibly testified that VitalGo did not actually supply these replacement parts and that Kreg was forced to cannibalize beds to take spare parts, which caused its inventory to shrink. [Trial Tr. Vol. I, at 66:9–23.] VitalGo has not offered any evidence to contradict this testimony. Thus, the Court concludes that VitalGo refused to supply Kreg with spare parts after VitalGo breached the Agreement.

value of the Agreement as of June 2, 2011 and took very different views of the case. Bradshaw placed the fair market value of the Agreement at approximately $1.7 million, whereas Godbout valued the Agreement at $4,000. The experts disagreed about, among other things, whether Kreg's inventory of beds should be included in the valuation, whether future profits should be included in the valuation, the size of Kreg's profit margin, the appropriate discount rate, and the accuracy of Kreg's revenue projections.

At the close of Plaintiff Kreg's case-in-chief, Defendant VitalGo made an oral Rule 52(c) motion for judgment on partial findings. [Trial Tr. Vol. III, at 240:10–241:6; 227, at 41.]

## III. Analysis and Conclusions of Law

### A. Plaintiff Kreg's Motion for Leave to File a Second Amended Complaint [210]

The Court must first address two motions that the parties filed on the eve of trial. On September 12, 2016, two weeks before trial, Defendant VitalGo filed a motion for judgment on the pleadings and to dismiss for failure to state a claim [206]. Plaintiff Kreg then filed a motion for leave to file a second amended complaint [210] on September 22, 2016. The Court took these motions under advisement and deferred briefing until after the bench trial. [See 208, 213.]

In its motion [206], Defendant VitalGo argues that Plaintiff Kreg's first amended complaint [17] should be dismissed because it fails to plead damages. To state a claim for breach of contract under New York law, a plaintiff must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Landmark Ventures, Inc. v. Wave Sys. Corp.*, 513 F. App'x 109, 111 (2d Cir. 2013) (citation and internal quotation marks omitted).

In response, Plaintiff Kreg seeks leave to file a second amended complaint "to conform its complaint to the evidence that was developed throughout the course of fact and expert discovery" and presented to the Court "in numerous prior pleadings, including the parties' 2013

summary judgment submissions and pretrial briefing." [210, at ¶ 1.] Under Federal Rule of Civil Procedure 15(a), a party may amend its pleading with leave of the court, and the "court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008). "Although the rule reflects a liberal attitude towards the amendment of pleadings, courts in their sound discretion may deny a proposed amendment if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile." *Soltys*, 520 F.3d at 743 (citation and internal quotation marks omitted).

Additionally, under Federal Rule of Civil Procedure 15(b), a party may move at any time "to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." Fed. R. Civ. P. 15(b)(2). The Seventh Circuit has noted that "[l]itigants who must frame their claims before obtaining discovery often find it necessary to conform their theories to the facts as time goes on." *Moriarty v. Larry G. Lewis Funeral Directors Ltd.*, 150 F.3d 773, 777 (7th Cir. 1998). Further, even if a party never formally amends its pleadings, when an issue not raised in a complaint is nevertheless litigated with the implied or express consent of the parties, "it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. (b)(2); see also *Torry v. Northrop Grumman Corp.,* 399 F.3d 876, 879 (7th Cir. 2005) (concluding that defendant's argument that trial court could not rule on merits of plaintiff's race discrimination claim presented at trial but never formally pled in her complaint was "frivolous" where the claim was the subject of "four years of discovery and other pretrial maneuverings"); *Laura v. Fuji Component Parts USA, Inc.*, 2016 WL 427510, at *6 (S.D. Ind. Feb. 2, 2016) ("Moreover, in accordance with Rule 15(b)'s goal of providing the maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities, the court may constructively amend

the pleadings to conform to the evidence at the summary judgment stage, even where there has been no formal motion by the parties." *Walton v. Jennings Cmty. Hosp., Inc.*, 875 F.2d 1317, 1320 (7th Cir. 1989).

Applying this controlling law to the case at hand, the Court grants Plaintiff Kreg leave to amend its complaint. Amendment is proper under Rule 15(b) because Plaintiff's proposed second amended complaint merely conforms to the damages evidence adduced during discovery and discussed in the parties' 2013 summary judgment briefing and pretrial briefing. Although Plaintiff originally sought injunctive relief, the subject of damages has been an issue in this case for several years. On March 28, 2013, in ruling on the parties' first cross-motions for summary judgment, the Court noted that "Kreg may be entitled to damages after further development of the record." [93, at 31.] Additionally, Plaintiff Kreg's renewed motion for summary judgment [95] sought "summary judgment on Plaintiff's alterative claim for damages." [95, at 1.] The Court denied summary judgment, concluding that it was "readily apparent that there is a material dispute as to the certainty with which Kreg can prove the fair market value of the lost asset." [131, at 15.] Further, Plaintiff Kreg's pretrial memorandum also presented a lost asset theory of damages based on the fair market value of the agreement. [204, at 12.]

In short, the parties have been litigating the issue of damages for years, and Defendant VitalGo has implicitly consented to litigating this issue by conducting fact and expert discovery concerning the merits of Plaintiff Kreg's request for damages, filing a summary judgment brief opposing Plaintiff Kreg's motion for summary judgment on damages, submitting a pretrial memorandum focused on the issue of damages, and arguing at trial that Kreg could not prove damages. [See 198, at 5, 7 (arguing that "there is no record evidence that VitalGo consciously assumed liability for breaching the exclusivity provision of the agreement" and that "even if

Kreg can recover special or consequential damages under a lost asset theory, they are minimal")]; see also *Hutchins v. Clarke*, 661 F.3d 947, 957 (7th Cir. 2011) (holding that defendants consented to the constructive amendment of the pleadings under Rule 15(b) by arguing the issue in their summary judgment briefing, and noting that "[t]he test for consent is whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment" (citation and internal quotation marks omitted)).

Therefore, the Court concludes that although Plaintiff Kreg's motion for leave to amend is a formality because Defendant VitalGo already implicitly consented to the constructive amendment of the pleadings, leave to amend is proper under Rule 15(b). Leave to amend also is proper under Rule 15(a) because Plaintiff Kreg did not unduly delay, Defendant VitalGo will not suffer prejudice since the parties have been litigating the issue of damages for years, and the amendment is not futile.[3] For all of these reasons, Plaintiff's motion for leave to amend [210] is

---

[3] Defendant VitalGo also argues that Plaintiff Kreg's motion for leave to amend is futile because Plaintiff Kreg's second amended complaint fails to plead specific facts that meet the requirements of Federal Rule of Civil Procedure 9(g), which mandates that "[w]hen items of special damages are claimed, they shall be specifically stated." Fed. R. Civ. Pro. 9(g); see also *Action Repair, Inc. v. Am. Broad. Companies, Inc.*, 776 F.2d 143, 149–50 (7th Cir. 1985). "[T]he level of specificity that must be provided under Rule 9(g) is uncertain and not reducible to formula. It will depend upon the nature of the claim, the type of injury sustained, and the causal connection between defendant's conduct and the damage." *Marseilles Hydro Power, LLC. v. Marseilles Land & Water Co.*, 2003 WL 259142, at *6 (N.D. Ill Feb. 4, 2003) (citation and internal quotation marks omitted). "An allegation of special damages is sufficient when it notifies the defendant of the nature of the claimed damages even though it does not delineate them with as great precision as might be possible or desirable." *Id.* (citation and internal quotation marks omitted). Defendant VitalGo argues that Plaintiff Kreg fails to sufficiently plead that its damages were the natural and probable consequence of VitalGo's breach and that the special damages were contemplated at the time the contract was executed. [212, at 7.]

The Court disagrees. Plaintiff alleges in its proposed second amended complaint that "[i]n reliance on the Agreement and Amendment, which provided Kreg exclusive distribution rights for the Total Lift Bed in the Exclusive Territories, Kreg entered into contracts with several major health care facilities," that "VitalGo's breach placed Kreg in jeopardy of becoming unable to fulfill its contractual obligations to health care providers," and that "[i]f Kreg was unable to fulfill [its customers'] orders, it risked losing the customer's entire business to RecoverCare, who could provide not only Total Lift Beds

granted, and Defendant VitalGo's motion for judgment on the pleadings and to dismiss the first amended complaint for failure to state a claim [206] is denied as moot.

## B.     Damages

Turning to the main issue at hand, the Court must determine whether Plaintiff Kreg can succeed on its claim for damages.  The parties agree that New York law applies, as provided in the Agreement.  At the outset, VitalGo argues that Kreg has failed to show that VitalGo's breach harmed Kreg.  First, VitalGo contends that its breach did not harm Kreg's reputation or its ability to meet customer demand.  However, this argument is a red herring, as Kreg is not proceeding under a theory of reputation damages; rather, as discussed below, Kreg is seeking lost asset damages.  Although Kreg was able to protect its reputation by ceasing its marketing of the Total Lift Beds after breach to ensure that demand for the beds did not outpace Kreg's supply, VitalGo's breach harmed Kreg by depriving it of the ability to develop a customer base without competition and solidify a corresponding income stream.

Next, VitalGo argues that Kreg was not harmed by the breach because Kreg continued to actively market the Total Lift Bed following VitalGo's breach.  Poulos testified at trial that when VitalGo breached the Agreement, Poulos "knew [Kreg was] in trouble and that [Kreg] would not be able to continue [its] efforts from a marketing standpoint because [Kreg was] going to be at risk of losing a big customer."  [Trial Tr. Vol. I, at 67:14–25.]  Poulos explained that Kreg then stopped its marketing and directed its sales people "not to actively solicit more orders [ ] for the Total Lift Bed, even if they had existing accounts" because Kreg had to make room for expected

---

but also the many other products that customers had historically ordered from Kreg.  [210-1, at ¶¶ 30, 32, 36.]  Plaintiff further alleges that "Due to the nature of the Agreement and Amendment, the parties' rights and obligations thereunder, VitalGo should have foreseen that, should it refuse to provide Kreg with Total Lift Beds and appoint another distributor—RecoverCare—as the new exclusive distributor in breach of the Agreement and Amendment, that it would be liable to Kreg for damages suffered as a result of VitalGo's breach in the form of lost profits and/or lost asset damages."  [210-1, at ¶ 49.]  Thus, the Court concludes that Plaintiff has pled damages in accordance with Rule 9(g).

growth from its recent marketing efforts. [*Id.*, at 68:7–19.] Similarly, Kreg's expert Bradshaw testified that Poulos advised him that he "didn't really aggressively market this business anymore because of the breach" and that "he basically was an order taker and continued to receive orders from customers." [Trial Tr. Vol. III, at 189:3–6.] VitalGo argues that the record shows that Kreg did not actually stop marketing the Total Lift Bed after VitalGo's breach. VitalGo contends that Kreg's website still called Kreg the exclusive distributor of the Total Lift Bed at least as of December 30, 2015, that Kreg's customer relations management records indicate that some sales people met with customers about the Total Lift Bed post-breach, and that Kreg attended some tradeshows after VitalGo's breach.

The Court does not find VitalGo's argument convincing. Kreg's records show that negligible marketing contacts occurred after VitalGo's breach and that many of these contacts related to servicing existing customers. Nor do Kreg's website or its participation in some tradeshows convince the Court to disregard Poulos's testimony that Kreg "switched off" its marketing efforts after VitalGo's breach. Poulos credibly testified that he had instructed his IT staff to remove any reference to the Total Lift Bed on Kreg's website, and a stray mention of the Total Lift Bed on Kreg's website does not indicate that Kreg's marketing efforts and customer solicitation efforts were in full force. Additionally, Kreg would have arranged and incurred the costs to participate in the trade shows well in advance of VitalGo's breach, and thus Kreg's participation in these tradeshows does not prove that Kreg was actively marketing the beds at pre-breach levels. For these reasons, the Court rejects VitalGo's argument that Kreg was actively marketing the beds and thus not harmed by VitalGo's breach of contract.

The Court now turns to Kreg's theory of damages. Plaintiff Kreg is seeking "lost asset" damages, which are a form of consequential damages. In an action for breach of contract, a

plaintiff may seek two categories of damages: (1) general or market damages, and (2) special or consequential damages. *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000). A plaintiff is seeking general or market damages when he tries to recover "the value of the very performance promised." *Id.* (citation and internal quotation marks omitted). Special or consequential damages, on the other hand, seek to compensate a plaintiff for additional losses that the plaintiff incurs as a result of the defendant's breach. *Id.* at 176. The type of consequential damages most often sought is lost operating profits of a business. *Id.* Another type of consequential damages is "lost asset" damages, which are at issue in this case. Lost asset damages may be recoverable where a defendant's breach of contract causes the plaintiff to lose an income-producing asset that was in its possession prior to the breach. *Id.* Lost asset damages are sometimes referred to as "hybrid" damages. *Id.* "When a defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value of the asset at the time of breach[.]" *Id.*; see also 1 *Dobbs Law of Remedies* at § 3.3(7) (Market value damages are "based on future profits as estimated by potential buyers who form the 'market'" and "reflect the buyer's discount for the fact that the profits would be postponed and * * * uncertain"). "[C]ourts have universally recognized that [lost profit damages and lost asset damages] are separate and distinct categories of damages." *Schonfeld*, 218 F.3d at 176.

To prevail on a lost asset theory of damages, Kreg must prove that (1) VitalGo's liability for Kreg's loss of the Agreement was "within the contemplation of the parties" when the Agreement was executed; (2) the Agreement was an income-producing asset with a determinable market value; and (3) the Agreement had a reasonably certain market value as of June 2, 2011, the date of VitalGo's breach. *Schonfeld*, 218 F.3d at 176–177. "The market value of an income-

producing asset is inherently less speculative than lost profits because it is determined at a single point in time. It represents what a buyer is willing to pay for *the chance* to earn the speculative profits." *Schonfeld*, 218 F.3d at 177. Therefore, courts apply the proof requirements "more leniently" for lost asset damages than for lost profit damages. *Id.*

### 1. Foreseeability of VitalGo's Liability for Consequential Damages

The requirement that lost asset damages must have been within the contemplation of the parties at the time the contract was entered into "is a rule of foreseeability." *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1010 (1993). The defendant is liable for those risks foreseen or which should have been foreseen at the time the contract was made. *Id.* However, the defendant need not have foreseen the breach itself or the particular way the loss came about. Rather, "[i]t is only necessary that loss from a breach is foreseeable and probable." *Id.* (citing Restatement Second of Contracts § 351; 3 Farnsworth, Contracts § 12.14, 2d ed. 1990). Where the contract is silent on the subject of consequential damages, the court must take a "common sense" approach and consider "the nature, purpose and particular circumstances of the contract known by the parties * * * as well as what liability the defendant fairly may be supposed to have assumed consciously." *Schonfeld*, 218 F.3d at 172 (citation and internal quotation marks omitted).

In the case at hand, the Agreement is silent on the subject of consequential damages. However, Poulos testified at trial that when he negotiated the Agreement with VitalGo, VitalGo's director of marketing, Norris Hansen, indicated that VitalGo was in need of a distributor who could work "in the acute space—the hospital market." [Trial Tr. Vol. I, at 39:17–22.] Poulos further testified that he made clear to Hansen that it would be a "big undertaking [for Kreg to] develop a new market" for the Total Lift Bed, and thus Kreg would need exclusive distribution rights to protect itself while it got the product "off the ground." [*Id.*

39:24–40:5.] Poulos explained that he had discussed with Hansen the fact that exclusivity was important to Kreg because it would be difficult to "build a whole new market," which "took time," and that Kreg "knew that right around the corner [it] was going to have some good outcomes and [ ] everything ready to go." [*Id.*, at 43:1–11.] According to Poulos, Hansen "agreed to those points." [*Id.*, at 40:12–17.]

In light of this undisputed testimony, the Court concludes that at the time the Agreement was executed, VitalGo was made aware that the Agreement would be an income-producing asset for Kreg: the exclusivity protection and access to the Total Lift Beds provided by the Agreement were necessary for Kreg to invest substantial resources in developing a market for the Total Lift Bed, which was a new product at the time, so that Kreg could build a customer base and enter into long-term bed rental contracts without competition in order to solidify a future income stream from bed rentals. Thus, VitalGo knew or should have known that if it breached the Agreement and deprived Kreg from reaping the benefit of its bargain, it would be liable for damages equal to the value of the lost asset.

This conclusion is supported by case law. In *Safka Holdings LLC v. iPlay, Inc.*, the plaintiff sued the defendant for anticipatory repudiation of a license agreement that granted the plaintiff exclusive use of defendant's trademarks for use in certain channels of trade, in exchange for royalties. 42 F. Supp. 3d 488, 490 (S.D.N.Y. 2013). The Court denied the defendant's motion to dismiss the plaintiff's claim for damages equal to the value of the license agreement, stating that "where the license to use the [ ] trademarks represented the principal form of consideration furnished by [d]efendant, there can be no question that the parties contemplated defendant's liability for denying [p]laintiff the very thing it had bargained for." *Id.* at 494. Here, Plaintiff Kreg bargained for the opportunity to develop an income stream from serving as the

exclusive distributor of the Total Lift Beds in certain territories, and Defendant VitalGo's breach denied Plaintiff "the very thing it had bargained for." *Id.*

Similarly, in *Western Geophysical Co. of Am. v. Bolt Assoc. Inc.*, the defendant gave plaintiff an exclusive license to use and to sublicense the defendant's patented "air gun device designed to provide a source of sound for use in underwater seismic exploration." 584 F.2d 1164, 1166–67 (2d Cir. 1978). The agreement required the plaintiff to use best efforts to promote the product. *Id.* at 1167. However, the defendant breached the agreement by terminating the exclusive license. *Id.* The Second Circuit explained that the defendant's breach "cut off" the plaintiff's "possibility of profits from the sublicensing scheme." *Id.* at 173. The court further explained that the profits were contemplated by the parties when they entered the contract and that "[t]here is no other arguable purpose for the exclusive licensing agreement than that the [product] be exploited financially." Accordingly, the court held that consequential damages were contemplated by the parties and affirmed the trial court's award of lost profit damages. *Id.* Here, Defendant VitalGo's breach cut off Kreg's potential profits from serving as the exclusive distributor of the Total Lift beds. Defendant VitalGo argues that *Western Geophysical* is a case about lost profit damages, and not lost asset damages, and therefore is irrelevant. However, this argument fails because lost profit damages and lost asset damages are both types of consequential damages, which must have been within the contemplation of the parties at the time of contracting in order to be recoverable. Thus, even though *Western Geophysical* is about lost profits damages and the case at hand is about lost asset damages, the reasoning of *Western Geophysical* applies here.

Next, Defendant VitalGo argues that the Agreement is not an income-producing asset and that rather, only the Total Lift Beds themselves produce income. VitalGo contends that since

Kreg was able to keep the Total Lift Beds in its possession after the breach, Kreg did not lose these income-producing assets. Relatedly, Defendant VitalGo argues that the Agreement is primarily a contract for the purchase of goods and that exclusivity was a mere ancillary benefit of the Agreement. According to VitalGo, parties generally do not contemplate consequential damages that are unrelated to the main purpose of a contract.

These arguments misrepresent the nature of the Agreement. Under the Agreement, Kreg agreed to use its best efforts to develop a market for the Total Lift Bed and to meet minimum purchase requirements, and in return, VitalGo agreed to give Kreg the exclusive opportunity to build a rental business for those beds in the original territories. The benefit of exclusivity was a bargained-for condition of the Agreement, not a mere "ancillary benefit." Plaintiff Kreg bargained for the opportunity to develop an income stream from serving as the exclusive distributor of the Total Lift Beds in certain territories. As an exclusive distributor, Kreg had the opportunity to build a customer base and enter into long-term bed rental contracts without competition in order to solidify a future income stream from bed rentals. The exclusivity provided to Kreg in the Agreement was key to Kreg developing this income stream. Indeed, Kreg introduced trial testimony indicating that Kreg expressed to VitalGo that Kreg would become a distributor of the Total Lift Beds only if VitalGo would grant Kreg exclusive distribution rights in certain territories. For these reasons, the Agreement itself is an income-producing asset, and VitalGo deprived Kreg of the benefits of the Agreement, even though Kreg kept the Total Lift Beds in its possession after the breach.[4] See *Western Geophysical*, 584 F.2d at 1164; *Safka Holdings LLC*, 42 F. Supp. 3d at 494.

_____

[4] The Court also notes that under the Agreement, VitalGo agreed to provide Kreg with spare parts for the beds for five years, which would have allowed Kreg to repair its beds and attempt to maintain its income stream. At trial, however, Kreg presented testimony that VitalGo refused to provide spare parts after it

Defendant VitalGo also argues that the Agreement's indemnity provision suggests that VitalGo did not foresee a broad scope of liability. Under the indemnity provision, Kreg "agrees to hold [VitalGo] free and harmless from any and all claims, damages, and expenses of every kind or nature whatsoever * * * as a direct or indirect consequence of termination of this Agreement in accordance with its terms." [Trial Ex. 1, at ¶ 27.] VitalGo also emphasizes that the Court noted at summary judgment that when taken in the light most favorable to VitalGo, the indemnity provision suggests that the parties did not contemplate lost profits as a basis for damages. [93, at 29.] The Court does not find this argument convincing. The Court referred to the indemnity provision in its summary judgment ruling as potential evidence that lost profit damages may not have been contemplated by the parties. At the summary judgment stage, the Court was required to construe the provision and the evidence as a whole in the light most favorable to VitalGo. However, VitalGo is no longer entitled this presumption at the current stage of litigation. Additionally, the Court was discussing lost profit damages in its summary judgment opinion, not lost asset damages.

Further, and perhaps most importantly, the indemnity provision refers to a termination "in accordance with" the terms of the Agreement. Here, VitalGo did not terminate the Agreement in accordance with its terms, and thus the indemnity provision does not apply. VitalGo argues that it subjectively believed that it was terminating the Agreement in accordance with its terms, which "suggests that VitalGo did not contemplate liability for the actions that now give rise to Kreg's requested lost asset damages." [242, at 7.] This argument fails for two reasons: foreseeability is an objective test, *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x 349, 351 (2d Cir. 2005), and the focus of the inquiry is on the risks the parties should have

---

breached the agreement in June 2011 and that Kreg was forced to cannibalize its beds for parts. Thus, VitalGo's breach also affected Kreg's ability to develop a future income stream in this manner.

foreseen at the time the contract was made. Thus, VitalGo's subjective beliefs at the time of breach are irrelevant.

Finally, Defendant VitalGo argues that Kreg's initial request for injunctive relief, rather than damages, indicates that the parties did not contemplate liability for lost asset damages. However, the fact that Kreg sought an injunction merely demonstrates that, at the time it filed suit, Kreg preferred that VitalGo perform its obligations under the Agreement to avoid incurring the damages that Kreg now seeks to recover. In sum, the Court concludes that lost asset damages were contemplated by the parties at the time of the execution of the Agreement.

### 2. Determinable Market Value of the Agreement

Next, Kreg must establish that the Agreement was an income-producing asset with a determinable market value. *Schonfeld*, 218 F.3d at 176–177. A contracting party may seek lost asset damages whether the asset is "tangible or intangible property or almost any kind of property right." *Safka Holdings LLC*, 42 F. Supp. 3d at 493 (citation and internal quotation marks omitted). "The mere fact that an asset's price is not apparent, as it would be if the asset were traded on a standardized exchange, is not a barrier to relief." *Id.* In cases of "unique or intangible assets," such as license agreements or other contractual rights, New York courts have embraced the hypothetical market standard, which looks to factors such as expert testimony, prior sales history, and evidence of sales of comparable assets to determine "the fair market value at which the property would change hands between a willing buyer and a willing seller." *Id.* (citation and internal quotation marks omitted). This value reflects, to a large extent, "a buyer's projection of what income he could derive from the asset in the future—i.e., lost profits—but it also factors in discounts for the time value of money and uncertainty." *Id.* at 493–94 (citation and internal quotation marks omitted).

As discussed above, the Agreement was an income-product asset, as it afforded Kreg the opportunity to build a customer base and enter into long-term bed rental contracts with hospitals without competition for the duration of the Agreement, and in doing so, solidify a future income stream from bed rentals. Further, the market value of the Agreement can be determined by calculating the fair market value at which the Agreement would change hands between a willing buyer and a willing seller. Thus, the Court concludes that Kreg has met its burden in proving that VitalGo's breach caused the loss of an income-producing asset with a determinable market value.

### 3. Fair Market Value of the Agreement

Finally, Kreg must prove the reasonably certain market value of the Agreement as of June 2, 2011, the date of VitalGo's breach. *Schonfeld*, 218 F.3d at 176–177. The parties offered expert testimony to support their views regarding the value of the Agreement as of June 2, 2011.

### a. Defendant VitalGo's Damages Calculation

At trial, VitalGo's expert Godbout testified that he believed the value of the Agreement was $4,000 on the date of VitalGo's breach. To determine the profits that a hypothetical buyer could earn from the Agreement, Godbout started by calculating the hypothetical buyer's revenues. Godbout assumed that the buyer could reasonably expect to generate $79,918 in revenue in the year following its purchase of the Agreement, because this is the amount of revenue that Kreg earned in its first year following execution of the agreement. To convert this revenue into expected profits, Godbout multiplied the revenue by an industry EBITDA[5] margin as reflected in an Integra Industry Ratio Report. Godbout used an EBIDTA margin of 5.2%, which results in a pre-tax cash flow of $4,130. Next, Godbout discounted the pre-tax cash flow to a present value using a discount rate of 22% and concluded that the present value of the

_____

[5] As Godbout testified, EBIDTA is earnings before interest, taxes, depreciation, and amortization.

hypothetical buyer's profits would equal roughly $4,000. Godbout concluded that $4,000 signified "the fair market value of what [Godbout] would expect a hypothetical arm's length buyer to pay for the Agreement." [227, at 13; Trial Tr. 276:11–14.]

The Court concludes that there are multiple problems with Godbout's damages calculation. As an initial matter, Godbout acknowledged that his opinions were formed in a "theoretical vacuum." He admitted that he had no knowledge of the Total Lift Bed, how long it had been on the market, or its uniqueness in the marketplace. [Trial Trans. Vol. IV, at 300:9–15; 290:25–291:8.] However, these factors would impact the profits that a hypothetical buyer could expect to earn from the Agreement and thus are relevant to determining the price that a hypothetical buyer would be willing to pay for the Agreement. See *Schonfeld*, 218 F.3d at 178 (fair market value is the price a willing buyer would pay "having reasonable knowledge of relevant facts").

Additionally, Godbout erred in basing his calculations on Kreg's revenue from the first year following the execution of the contract, instead of the second year of the contract, which was the year immediately preceding the breach. In doing so, Godbout overlooked that in the time between the execution of the contract and VitalGo's breach, Kreg invested substantial resources in marketing efforts to create a market and grow demand for the Total Lift Beds. Kreg's revenue in 2010, the first year of the contract, was $78,918. By 2011, Kreg's revenue had grown to $193,957. Thus, Godbout's assumption that the hypothetical buyer's profits would be similar to those of Kreg in 2010 disregards the historical growth in the demand for the Total Lift Bed.

Importantly, Godbout erred in basing his analysis on the assumption that the hypothetical buyer would be a small or undeveloped company that would have planned to rent out Total Lift

Beds as a stand-alone business. He similarly assumed that the buyer would lack economies-of-scale typical of larger, existing medical supply companies. This erroneous assumption led Godbout to use an EBITDA rate that resulted in very low anticipated profits. Godbout's assumptions disregard the more likely possibility that the hypothetical buyer would add the Total Lift Bed as a business line or segment to its existing operations, which would allow it to achieve incremental profits. See *In re Application of MobiTv, Inc.*, 712 F.Supp.2d 206, 232 (S.D.N.Y. 2010) (fair market value is determined with reference to "an agreement reached after arms' length negotiations between similarly situated parties."). Indeed, VitalGo actually entered into a multimillion-dollar deal for nationwide exclusive distribution rights with RecoverCare, a national medical equipment distributor.[6] [231, at 7–8.] An existing medical supply company, unlike an undeveloped company attempting to rent out the Total Lift Bed as a stand-alone business, would not have to substantially increase its fixed costs, such as salaries, facility leases, and equipment costs, to offer the Total Lift Bed as an additional product. Instead, an existing distributor of specialty medical equipment would be poised to leverage existing infrastructure, operations, and customer relationships to maximize its earning potential under the Agreement. Therefore, the anticipated profitability from renting out the Total Lift Beds would be higher than Godbout concluded.

Relatedly, the Court rejects Godbout's use of a 22% discount rate based on a weighted average cost of capital. Plaintiff Kreg argues that Godbout's chosen discount rate is based on incorrect assumptions about the identity of the hypothetical buyer. The Court agrees and does not find persuasive Godbout's use of a 6.4% small stock risk premium or a 5% company specific

---

[6] The Court is not convinced by VitalGo's argument that the RecoverCare agreement is not an appropriate comparison point. VitalGo argues that that the RecoverCare agreement was not signed until after the breach, and thus a hypothetical buyer could not have considered this agreement in a hypothetical negotiation. This argument misses the mark, as the RecoverCare agreement serves as an example of what a hypothetical buyer, such as RecoverCare, would have paid for the rights under the Agreement.

risk premium. Godbout's incorporation of a 6.4% small stock risk premium into the discount rate is based on the assumption that the buyer would be a small or unestablished company. However, as discussed above, the evidence presented at trial does not support this assumption. Rather, Godbout admitted at trial that the buyer would not necessarily be a small company but could also be a Fortune 500 company. [Trial Trans. Vol. IV at 271:2–16.] And VitalGo actually entered into a multimillion-dollar deal for nationwide exclusive distribution rights with RecoverCare, a national medical equipment distributor. [231, at 7–8.] Additionally, the Court is not persuaded by Godbout's use of a 5% company specific risk premium. Godbout testified that he included this 5% company specific risk premium because the hypothetical buyer's purchase of the Agreement would carry additional risk given the short term nature of the rights granted under the Agreement and the undiversified nature of the Agreement (i.e., it relates to a single product). However, as discussed above, the hypothetical buyer likely would be incorporating the Total Lift Bed into an existing medical supply business with diversified operations. Thus, any risk associated with the undiversified nature of the Agreement would be offset by the existing company's other product lines. Godbout admitted at trial that if he were to remove the 6.4% small stock risk premium and the 5% company specific risk premium from his discount rate, then his discount rate would be approximately 10.6%, which approximates the 10.08% discount rate used by Plaintiff's expert Bradshaw.

Godbout also erred in only focusing on the time period between the date of breach and the end of the exclusivity period in the Agreement and ignoring the income-producing nature of the Agreement. Godbout assumed that the hypothetical buyer would earn little to no revenue as a result of the Agreement after the exclusivity period ended on May 31, 2012. Godbout based this assumption on anticipated price erosion from the emergence of other competitors in the

market.  However, he did not present any analysis as to what the projected competitive landscape would look like or how prices would hypothetically fall based on these hypothetical competitors. The Court rejects this assumption because it does not comport with the overarching purpose of the exclusivity in the Agreement.  The exclusivity period would permit the hypothetical buyer to solidify a customer base, build relationships, and enter into long-term bed rental contracts with hospitals without competition for the duration of the Agreement.  These relationships and customer base would likely permit the hypothetical buyer to continue earning profits beyond the end of the exclusivity period, and this benefit must be accounted for in determining the value of the Agreement.  See *Schonfeld*, 218 F.3d at 176 (explaining that the fair market value of an asset may be based on a buyer's projections of what income he could drive from the asset in the future).  In fact, Kreg presented evidence at trial that it was building demand for the Total Lift Bed from hospital customers with whom it was developing long-term relationships.  [Trial Trans. Vol. I, at 51:15–20, 54:11–25.]

Finally, in concluding that the Agreement was only worth $4,000 at the time of breach, Godbout did not consider whether it would have made business sense for Kreg to sell the Agreement for only $4,000 on June 2, 2011.  Under New York law, the "value placed on an asset by a purchaser [ ] does not become evidence of the asset's market value unless it is also the price at which a reasonably informed seller is willing to sell the asset."  *Schonfeld*, 218 F.3d at 181 (explaining that in the absence of an agreed upon sales price, an expert would have to testify as to (1) all the relevant factors that the hypothetical buyer would consider in determining what to offer for the agreement; and (2) the factors that the hypothetical seller would consider in deciding at what price to sell).  From March through May 2011, Kreg earned an average of $15,000 per month in revenue.  [Trial Ex. 21.]  Thus, as the hypothetical seller, Kreg would not

agree to sell the Agreement for $4,000 and forsake a monthly revenue stream of $15,000. It would be illogical for Kreg to relinquish a growing income stream and to allow a competitor to reap the rewards of Kreg's marketing efforts and take over that revenue stream. For all of these reasons, the Court is not persuaded by Godbout's valuation of the Agreement.

### b. Bradshaw's Damages Calculation

Plaintiff Kreg presented the expert testimony of William Bradshaw, who concluded that the Agreement was worth $1.7 million at the time of breach. Bradshaw valued the Agreement based on a hypothetical buyer's projection of future income to be derived from the Agreement. In other words, he determined future earnings that a hypothetical buyer would anticipate deriving from the Agreement from June 2, 2011 forward, and then discounted this amount to account for the time value of money and the risk that those earnings might not fully materialize. [231, at 28; Trial Trans. Vol. II, at 154:2–156:1.] First, Bradshaw calculated the annual profit margins for the duration of the anticipated 10-year useful life of the beds. To do so, Bradshaw examined Kreg's historical revenue from renting the beds through June 2, 2011 and projected a 10% month over month growth until Kreg achieved a 70% utilization rate. He assumed that Kreg would have 40 beds because Kreg actually had 35 beds in its inventory and ordered 5 additional beds from VitalGo after the breach. Bradshaw then calculated expenses and subtracted these expenses from the revenue to get the anticipated annual profit margins from June 2011 through March 2020.[7] Next, Bradshaw assumed a 10.08% discount rate and discounted the anticipated annual profit margins to present value as of June 2, 2011. Bradshaw took the sum of these present values and ostensibly included the value of Kreg's inventory of 35 beds to determine the total

---

[7] It is unclear to the Court why Bradshaw extended his analysis through March 2020, as this would exceed a 10-year useful life of the beds.

market value of the Agreement as of the date of breach.[8]  [Trial Tr. Vol. II, at 156:2–157:11.]

Bradshaw calculated that 55% percent of this total market value of the Agreement would stem

from the original territories, because he assumed that 22 of the 40 beds—or 55% of the beds—

would be used in the original territories.  Next, Bradshaw added a 10% multiplier to account for

the value of exclusivity afforded to the buyer under the agreement.  Bradshaw concluded that the

total market value of the Agreement in the original territories as of the date of breach was

$1,727,348.  At trial, Bradshaw explained that in calculating damages, he then subtracted the

actual profits that Kreg had earned from its rental of the Total Lift Beds in the original territories

from June 2, 2011—the date of breach—through June 2016.  [Trial Trans. Vol. III, at 199:1–

200:16; 202:11–14; 202:24–203:9.]  Thus, Bradshaw concluded that that Kreg's damages were

$1,657,832, not reflecting prejudgment interest.

Defendant VitalGo argues that the Court should exclude Bradshaw's expert opinion

under *Daubert*.  Federal Rule of Evidence 702[9] and the Supreme Court's decision in *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the

admissibility of expert testimony.  *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th

---

[8] It is unclear to the Court how, exactly, Bradshaw added in the value of the inventory in his calculation of the fair market value of the Agreement.  It appears from Bradshaw's Schedule 1A, [Trial Ex. 22, at Schedule 1A], that Bradshaw assumed that the value of the inventory was somehow built into the forecasted profit margins.  However, it is far from clear why the value of the inventory would be included in the forecasted profit margins from rentals.

This ends up being a moot point, however, and does not affect the Court's final damages calculation.  As explained below, the Court concludes that it is incorrect to include the value of Kreg's inventory of 35 Total Lift Beds into the value of the Agreement, since Kreg kept these beds after the breach.

[9] Federal Rule of Evidence 702 states:
   A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or a determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Cir. 2015). Rule 702 requires the district court judge to act as a gatekeeper to ensure that admitted expert testimony is relevant, reliable, and has a factual basis. *Id.* at 809; see also *Daubert*, 509 U.S. at 589. The Seventh Circuit has stressed that "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]" *Textron*, 807 F.3d at 834 (citation and internal quotation marks omitted) (alteration in original). To determine whether expert testimony is admissible, the district court must ascertain (1) whether the expert is qualified, (2) whether his methodology is scientifically reliable, and (3) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142; see also *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009).

The Seventh Circuit has clarified that *Daubert*'s reliability and relevancy requirements "continue to apply in a bench trial." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010). "However, the usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in such a setting[.]" *Id.* As such, the Court may defer making reliability determinations until after the evidence is presented. *Id.*; *Matter of Complaint of Ingram Barge Co.*, 2016 WL 4366509, at *2 (N.D. Ill. Aug. 16, 2016). A district court conducting a bench trial must nevertheless provide more than "conclusory statements of

admissibility or inadmissibility to show that it adequately performed its gatekeeping function." *Metavante*, 619 F.3d at 760.

Plaintiff's expert Bradshaw is a Certified Public Accountant, Certified Valuation Analyst, and Certified Fraud Examiner. He is the global managing partner at MDD Forensic Accountants has been engaged as a forensic accountant on "thousands of occasions," and has done valuations in the health care industry, including medical suppliers. [231, at 12.] The Court concludes, and Defendant VitalGo does not dispute, that Bradshaw is qualified to render an expert opinion on damages in this case.

VitalGo argues that Bradshaw's expert opinion is unreliable and irrelevant for two main reasons. First, VitalGo argues that Bradshaw conducted a lost profits analysis instead of a lost asset analysis. Second, VitalGo argues that Bradshaw erred in including assets beyond the Agreement itself in his valuation. According to VitalGo, Bradshaw should have valued only the one year of exclusivity in the original territories and the ability to purchase beds from VitalGo for $8,500 for one year, as these were the only rights provided to Kreg under the Agreement. According to VitalGo, Bradshaw improperly included in his analysis the value of Kreg's inventory of Total Lift Beds and the value of the future rental earnings stream of those beds, even though Kreg still owned, rented, and generated revenue from the beds following VitalGo's breach.

The Court is not persuaded by VitalGo's argument that Bradshaw improperly conducted a lost profits analysis or that he erred in including in his analysis the value of the future income stream from renting out the beds. The Agreement is an income-producing asset that would permit the hypothetical buyer to serve as the exclusive distributor of Total Lift Beds, build a customer base, and enter into long-term bed rental contracts with hospitals without competition

for the duration of the Agreement, thus solidifying a future income stream from bed rentals. In other words, the value of the Agreement is not contained only in the right to exclusivity for one year and the right to purchase beds from VitalGo for one year. Rather, the Agreement embodies the opportunity to develop a customer base and to lay the foundation for future profits during the term of the Agreement, and to continue generating revenue from these customers after the term of the Agreement. It is not improper to analyze lost profits as part of a lost asset damages calculation, as a hypothetical buyer would consider Kreg's historical data and forecasted profits in determining how much it would be willing to pay for the chance to earn speculative profits under the Agreement. See *Schonfeld*, 218 F.3d at 177 ("The market value of an income-producing asset     * * * represents what a buyer is willing to pay for the chance to earn the speculative profits."); 1 *Dobbs Law of Remedies* at § 3.3(7) (market value damages are "based on future profits as estimated by potential buyers who form the 'market'" and "reflect the buyer's discount for the fact that the profits would be postponed and * * * uncertain"). For these reasons, the Court also rejects VitalGo's related argument that Bradshaw incorrectly determined the market value of the Agreement from Kreg's perspective, instead of from the perspective of a hypothetical buyer.

Additionally, Kreg's forecasted profits would bear on the price at which Kreg, as the hypothetical seller, would be willing to sell its rights under the Agreement. See *Schonfeld*, 218 F.3d at 181 ("The value placed on an asset by a purchaser [ ] does not become evidence of the asset's market value unless it is also the price at which a reasonably informed seller is willing to sell the asset."). Finally, Bradshaw accounted for the fact that Kreg kept the beds and continued to generate revenue from renting out the beds. At trial, Bradshaw explained that in calculating damages, he subtracted $69,533 from the fair market value of the Agreement because Kreg

earned approximately $69,533 in profit from its rental of the Total Lift Beds in the original territories from June 2, 2011—the date of breach—through June 2016. [Trial Trans. Vol. III, at 199:1–200:16; 202:11–14; 202:24–203:9.] Thus, Bradshaw's valuation did not afford Kreg a double recovery in rental profits.

However, the Court does agree that Bradshaw erred in including in his analysis of the value of Kreg's existing inventory of 35 Total Lift Beds. According to Bradshaw, the inventory value as of the date of breach was $266,093. [Trial Ex. 22, at Scheduled 1A, Schedule 4.] It is incorrect to include this amount in the lost asset damages calculation because these assets are not "lost"—Kreg still owns the 35 Total Lift Beds. Permitting Kreg to recover the value of this inventory would not work to make Kreg whole again; rather, it would afford Kreg a double recovery. Thus, the Court will disregard that portion of Bradshaw's expert opinion.[10]

Next, VitalGo argues that Bradshaw made unwarranted assumptions in his damages analysis that render his opinions unreliable and inadmissible. VitalGo contends that Bradshaw erred in using a 70% utilization rate, assuming a 10% month-over-month revenue growth rate, assuming a 10-year useful life for the Total Lift Bed, and using a 10.08% discount rate. However, these arguments go to the "ultimate correctness" of Bradshaw's damages calculation, and not to the admissibility of Bradshaw's expert opinion. See *Textron*, 807 F.3d at 834 ("[T]he key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the

---

[10] The Court expresses no opinion on whether the 35 Total Lift Beds in Kreg's inventory would have to be sold to the hypothetical buyer with the Agreement, as assumed by Bradshaw, or whether the beds would not be part of the transaction, as assumed by Godbout. Under either scenario, Kreg would not recover the value of the beds as a component of its damages. Under Bradshaw's scenario, the hypothetical buyer would buy the inventory of beds plus the rights under the Agreement. The price of the sale would thus equal the market value of the Agreement plus $266,093—the value of the beds. However, $266,093 would then be subtracted to arrive at the correct amount of damages, since Kreg still owns the beds. Under Godbout's scenario, the hypothetical buyer would already own Total Lift Beds or would obtain beds from another source unrelated to this transaction. The buyer would only purchase from Kreg the rights under the Agreement, and the Kreg's damages would not include the $266,093 value of the beds.

soundness and care with which the expert arrived at her opinion[.]").  For all of these reasons, the Court concludes that Bradshaw's expert testimony is admissible.

### d.    The Court's Damages Calculation

Although the Court has determined that Bradshaw's expert testimony is admissible, the Court does not find all of Bradshaw's assumptions and calculations persuasive.  The Court views Bradshaw's valuation as a good starting point for determining Kreg's damages, but the Court rejects some of Bradshaw's assumptions and must recalculate Kreg's damages accordingly.

As an initial matter, the Court accepts Bradshaw's assumption that the Total Lift Beds would have a 10-year useful life and thus that the hypothetical buyer would anticipate earning profits starting in Year 3 of the Agreement plus an additional 7 years, until the end of the useful life of the beds.  Importantly, VitalGo admitted at the summary judgment stage that the Total Lift Beds have a useful life of 10 years.  [119 (VitalGo's Response to Kreg's Statement of Facts), at ¶ 28 ("The Total Lift Beds have a ten-year useful life, based on Kreg's depreciation protocol and general accounting practices."); 131, at 11–12 ("The parties agree as to the useful life of the Total Lift Bed.").]  Moreover, the Agreement provides that VitalGo would provide Kreg with spare parts for the beds for five years after the date of Kreg's last purchase.  [Trial Ex. 1, at ¶ 20; 231, at 40.]  Considering the three-year term of the Agreement plus five years of spare parts from VitalGo, the Court concludes that a 10-year useful life of the beds is a reasonable assumption.  The Court also accepts Bradshaw's assumption that rental revenues from the beds would increase 10% monthly from November 2011 through May 2012.  This assumption is reasonable based on Kreg's historical growth and marketing efforts.   Additionally, the Court adopts Bradshaw's 10.08% discount rate, which appropriately accounts for the time value of money and the risk inherent in attempting to achieve future profits.  As discussed above, the Court rejects

the 22% discount rate used by VitalGo's expert Godbout because it unreasonably incorporates a 6.4% small stock risk premium and a 5% company specific risk. Godbout admitted at trial that if he were to remove the 6.4% small stock risk premium and the 5% company specific risk premium from his discount rate, then his discount rate would be approximately the same as Bradshaw's 10.08% discount rate.

On the other hand, the Court rejects Bradshaw's assumption that the Total Lift Bed would achieve a 70% utilization rate. Bradshaw testified at trial that Kreg's utilization rates historically were no greater than 40%. [Trial Tr. Vol. III, at 236:3–8.] Bradshaw further testified that the actual utilization rates were "in the 30-plus percent range" in "some months" and "got up close to 40 percent in one or two months." [*Id.* Vol. II, at 164:5–17.] The Court concludes that the evidence does not support a 70% utilization rate and that a 40% utilization rate is more appropriate. The Court notes that using a 40% utilization rate to calculate the value of the Agreement assumes some growth in the utilization rate from in "the 30-plus percent range" and only hitting 40% in one or two months, to an average utilization rate of 40%. Next, the Court rejects Bradshaw's assumption that future earnings would be based on 40 beds, instead of 35 beds as existed in Kreg's inventory at the time of breach. Bradshaw based his assumption on the fact that Kreg ordered 5 additional beds after the breach. However, Kreg never paid for or received these 5 additional beds, and thus the Court will not include them in its damages calculation. Accordingly, the Court also declines to consider Bradshaw's calculation of the cost of acquiring the 5 additional beds.

Next, the Court rejects Bradshaw's addition of a 10% multiplier for exclusivity for two reasons. Bradshaw added this multiplier because he determined that a hypothetical buyer would recognize that the exclusivity provision created greater certainty that the projected future rental

earnings would be achieved because there would be no competition for the remainder of the Agreement to erode revenues or interfere with efforts to become ingrained with customers. However, the value of exclusivity is already built into Bradshaw's calculations of the future profit stream afforded by the Agreement, because exclusivity is what would allow the hypothetical buyer to build the customer relationships and enter into the contracts that would bring in future profits. Additionally, there is no support for Bradshaw's choice of a 10% multiplier, as he did not use any methodology or conduct any analysis to reach the 10% exclusivity premium. Thus, it is nothing more than *ipse dixit*. [See Trial Tr. 229:4–230:4.] Finally, as previously explained, the Court rejects Bradshaw's inclusion of the value of the inventory of Kreg's 35 beds because Kreg kept the beds after the breach.

With these base assumptions in mind, the Court calculated the value of the Agreement by: (1) taking the sum of the present value of the annual profit margins for Year 3[11] (June 2011 through May 2012) through Year 10[12] (June 2018 through May 2019) to determine the total market value of the Agreement as of the date of breach; (2) taking 48.6%[13] of this value to determine the value of the Agreement in the original territories; and (3) subtracting $69,533 to account for Kreg's actual profits from the date of breach through June 2016.[14] This methodology

---

[11] The hypothetical buyer would acquire the rights under the Agreement at the beginning of Year 3 of the Agreement.

[12] This timeline comes from the 10-year useful life of the beds.

[13] This percentage differs from Bradshaw's use of 55%, or 22 out of 40 beds, because the Court did not include the additional 5 beds in its analysis. 17 out of 35—or 48%—of Kreg's Total Lift Beds were actually used in the original territories.

[14] Bradshaw testified at trial that Kreg's actual profits from the date of breach through June 2016 were $69,533, and VitalGo has not rebutted this testimony. [Trial Trans. Vol. III, at 199:1–200:16; 202:11–14; 202:24–203:9.]

follows Bradshaw's calculations in Schedule 1A, [Trial Ex. 22, Schedule 1A], but is adjusted based on the assumptions discussed above.

The annual profit margin for Year 3 is $224,662 (reduced from Bradshaw's calculation of $247,567). To determine this amount, the Court first calculated the revenue for Year 3 by adding Kreg's actual revenue from June 2011 through October 2011 plus the forecasted revenue from November 2011 through May 2012, assuming 10% monthly growth, but scaled back to 35 beds instead of 40 beds for the forecasted months. The Court then scaled back the expenses in Bradshaw's Schedule 2, [Trial Ex. 22, at Schedule 2], to account for 35 beds for November 2011 through May 2012 instead of 40 beds.[15] The Court subtracted the expenses from the revenue to determine that the profit margin for Year 3 is $224,662.

The profit margin for Year 4 through Year 10 is $270,353 per year (reduced from Bradshaw's calculation of $536,204). To determine this amount, the Court used Bradshaw's formula to determine revenue based on the theoretical utilization of the beds, but reduced the inputs to 35 beds and 40% utilization instead of 40 beds and 70% utilization.[16] The Court then scaled back the expenses in Bradshaw's Schedule 2, [Trial Ex. 22, at Schedule 2], to account for

---

[15] The Court assumes that Bradshaw's Schedule 2 contains Kreg's actual expenses for its 35 beds for June 2011 through October 2011, to correspond with his use of Kreg's actual revenue for these same months.

The Court used the following formula to scale back the expenses to 35 beds for November 2011 through May 2012: (7/12 x Expense x 35/40) + (5/12 x Expense). This formula reflects the Court's decision to scale back expenses for 7 out of 12 months (November 2011 through May 2012) and not for the first 5 months of Year 3 (June 2011 through October 2011).

[16] Bradshaw calculated revenue based on theoretical utilization using the following formula:
40 beds x 70% utilization rate x $90/day rental x 365 days/year = $919,800.

The Court modified this formula as follows: 35 x 40% x 90 x 365 = $459,900.

35 beds instead of 40 beds.[17]  The Court subtracted the expenses from the revenue to determine that the profit margin for Year 4 through Year 10 is $270,353 per year.

Next, the Court applied a 10.08% discount rate to determine the present value of the profit margin for each year, thus accounting for the time value of money and the uncertainty associated with earning future profits.  The sum total of the present value of the profit margins for Year 3 through Year 10 comes to $1,465,315, which represents the total value of the Agreement as of the date of breach.  The Court then took 48.6% of this amount to account for the fact that 17 out of 35 beds, or 48.6% of the beds, were used in the original territories.[18]  Finally, the Court subtracted $69,533 to account for Kreg's actual profits from breach through June 2016.  Therefore, the Court concludes that Kreg is entitled to $642,610 in damages, not reflecting prejudgment interest.

In sum, these damages represent the value of the Agreement at the time of VitalGo's breach of contract, which is the value of the opportunity to build a customer base and enter into long-term bed rental contracts without competition for the duration of the Agreement, and thus to solidify a future income stream from bed rentals.  Thus, the Court denies Defendant VitalGo's Rule 52(c) motion for judgment on partial findings, and grants Plaintiff Kreg $642,610 in damages, not reflecting prejudgment interest.

### e.  Prejudgment Interest

Finally, the Court must calculate prejudgment interest.  Plaintiff Kreg contends that under New York law, prejudgment interest at the rate of 9% is recoverable as of right in an action at law.  Defendant VitalGo does not respond to this argument.  In diversity actions, federal courts look to state law to determine the rules for computing prejudgment interest.  *Allen & O'Hara,*

---

[17] The Court used the following formula to scale back the expenses to 35 beds: Expense x 35/40.

[18] $1,465,315 x .486 = $712,143

*Inc. v. Barrett Wrecking, Inc.*, 964 F.2d 694, 695 (7th Cir. 1992). New York law expressly provides for the award of prejudgment interest in breach of contract cases as a matter of right, and the statutory interest rate for a breach of contract action is 9% per annum. *Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, 577 F. App'x 58, 61 (2d Cir. 2014); N.Y. Civ. Prac. L. & R. 5001(a) (McKinney 1992); N.Y. Civ. Prac. L. & R. 5004). New York courts have held that in a breach of contract action, prejudgment interest must be calculated on a simple interest basis at the statutory rate of 9%, and interest should not be compounded. See, *e.g.*, *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998), modified on other grounds by *Baron v. Port Auth. of New York & New Jersey*, 271 F.3d 81 (2d Cir. 2001).

New York law provides that prejudgment interest "shall be computed from the earliest ascertainable date the cause of action existed." *Pac. Westeel, Inc. v. D & R Installation*, 2003 WL 22359512, at *3 (S.D.N.Y. Oct. 17, 2003) (citing C.P.L.R. § 5001(b)). A breach of contract cause of action accrues at the time of the breach. *Cont'l Cas. Co. v. Contest Promotions NY, LLC*, 2016 WL 1255726, at *7 (E.D.N.Y. Mar. 28, 2016). Thus, in the case at hand, prejudgment interest began to accrue on June 2, 2011, the date of breach, and runs until the date on which this Court enters judgment. In sum, prejudgment interest accrued at a rate of $158.45 per day[19] for 2,301 days between June 2, 2011 and September 19, 2017, for a total of $364,593 in prejudgment interest. See *Kuruwa v. Meyers*, 823 F. Supp. 2d 253, 261 (S.D.N.Y. 2011), aff'd, 512 F. App'x 45 (2d Cir. 2013) (calculating prejudgment interest by determining the daily interest rate and the number of days between the date on which the interest began to accrue and the date of judgment); *Pac. Westeel, Inc. v. D & R Installation*, 2003 WL 22359512, at *4 (S.D.N.Y. Oct. 17, 2003) (same).

---

[19] 9% per annum is equal to .02466 percent per day. .02466 percent times the principal damages amount of $642,610 equals $158.45 interest per day.

**IV.    Conclusion**

For the foregoing reasons, Plaintiff's motion for leave to amend [210] is granted and Defendant VitalGo's motion for judgment on the pleadings and motion to dismiss the first amended complaint for failure to state a claim [206] is denied as moot. Defendant's oral Rule 52(c) motion is denied. The Court awards Plaintiff Kreg $642,610 in damages plus $364,593 in prejudgment interest, for a total award of $1,007,203. This case is set for further status hearing on October 10, 2017, at 10:00 a.m.

Date: September 19, 2017

_____
Robert M. Dow, Jr.
United States District Judge

**Revenues**

**Year 3**

| | Month | Bradshaw's Calculation | Court's Calculation |
|---|---|---|---|
| (A) | Jun-11 | 14,873 | 14,873 |
| | Jul-11 | 16,226 | 16,226 |
| | Aug-11 | 19,931 | 19,931 |
| | Sep-11 | 24,556 | 24,556 |
| | Oct-11 | 30,886 | 30,886 |
| (B) | Nov-11 | 33,975 | 29,728 (C) |
| | Dec-11 | 37,372 | 32,701 |
| | Jan-12 | 41,109 | 35,970 |
| | Feb-12 | 45,220 | 39,568 |
| | Mar-12 | 49,742 | 43,524 |
| | Apr-12 | 54,716 | 47,877 |
| | May-12 | 60,188 | 52,665 |
| | **Total Revenue:** | **428,794** | **388,504** |

Notes:
(A) Kreg's actual revenues for June 2011 through October 2011
(B) The Court's calculations and Bradshaw's calculations assume a 10% month-over-month revenue growth rate from November 2011 through May 2012.
(C) The Court's calculations reduced Bradshaw's calculations to 35 beds instead of 40 beds, for November 2011 through May 2012.

**Years 4-10**

**Bradshaw's Calculation**
40 beds x 70% utilization x $90/day x 365 =                919,800

**Court's Calculation**
35 beds x 40% utilization x $90/day x 365 =                459,900

**Expenses**

| | Year 3 | | | Years 4-10 | |
| --- | --- | --- | --- | --- | --- |
| | Bradshaw | Court (A) | | Bradshaw | Court (B) |
| Truck Expense | 22,174 | 20,557 | | 47,565 | 23,783 |
| Cleaning and Sanitation Labor | 71,584 | 66,364 | | 153,553 | 76,777 |
| Payroll Taxes | 5,727 | 5,309 | | 12,284 | 6,142 |
| Sales Comission | 47,167 | 43,728 | | 101,178 | 50,589 |
| Marketing | 6,856 | 6,356 | | 14,707 | 7,354 |
| Repairs and Maintenance | 11,983 | 11,109 | | 25,703 | 12,852 |
| Supplies | 4,447 | 4,123 | | 9,540 | 4,770 |
| Travel Costs | 6,790 | 6,295 | | 14,565 | 7,283 |
| **Total:** | **176,728** | **163,842** | | **379,095** | **189,548** |

Notes:

(A) The Court's calculation reduced Bradshaw's calculation to 35 beds for Nov. 2011-May 2012 (forecasted months). The expenses for June 2011 - Oct. 2011 were not reduced under the assumption that Kreg's actual costs were used for these months, to correspond with the use of Kreg's actual revenues for these months.

(B) The Court's calculation reduced Bradshaw's calculation to 35 beds and 40% utilization.

**Table 1A Revised**

| Year | Annual Profit Margin (Revenue - Expenses) | Discount Rate | Mid-point Convention | Present Value as of 6/2/11 |
|------|------|------|------|------|
| 3 | 224,662 | 10.08% | 0.5 | 214,128.96 |
| 4 | 270,353 | 10.08% | 1.5 | 234,082.29 |
| 5 | 270,353 | 10.08% | 2.5 | 212,647.43 |
| 6 | 270,353 | 10.08% | 3.5 | 193,175.36 |
| 7 | 270,353 | 10.08% | 4.5 | 175,486.33 |
| 8 | 270,353 | 10.08% | 5.5 | 159,417.09 |
| 9 | 270,353 | 10.08% | 6.5 | 144,819.30 |
| 10 | 270,353 | 10.08% | 7.5 | 131,558.23 |
| | | | **Total Value of Agreement:** | **1,465,315.00** |

48.60%

**712,143** (A)
-69,533 (B)

**Total Damages:** **642,610**

Notes:

(A) Total Value of Agreement multiplied by 48.6% because 17/35 beds used in the original territories

(B) Subtract Kreg's actual profits from breach through June 2016